## CENTRAL R. CO. OF NEW JERSEY v. HUDSON.

(Circuit Court of Appeals, Third Circuit.    November 13, 1913.)

No. 1,750.

1. RAILROADS (§ 316*) — ACCIDENTS AT CROSSINGS — SPEED OF TRAIN — SAFETY GATES.

A train may safely, and in the exercise of due care, use a higher rate of speed at a crossing guarded by safety gates than at one at which no such safeguard exists.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1006–1008, 1011, 1012; Dec. Dig. § 316.*]

2. RAILROADS (§ 351*)—ACTION FOR INJURY AT CROSSING—INSTRUCTIONS.

Plaintiff, while passing over a street crossing in the evening, was struck and injured by a freight car which was being pushed along a side track by an engine of defendant railroad company, and brought an action for damages, alleging negligence in moving the car at too great speed, in failing to carry a light thereon, and in not ringing the engine bell. Contributory negligence was also an issue. There were safety gates at the crossing, maintained and operated by another company, which owned the road, and whose tracks defendant was using. There was testimony from several witnesses that the gates were closed before the car reached the crossing, and there were warning bells or gongs which rang as the gates were lowered. *Held*, that whether or not the gates were closed was a most important factor on the issues of negligent speed and contributory negligence, without regard to whose duty it was to operate them, and that it was error to refuse to so charge, and to ignore the question in the instructions given.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1193–1211, 1213–1215; Dec. Dig. § 351.*]

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action at law by George Hudson against the Central Railroad Company of New Jersey. Judgment for plaintiff, and defendant brings error. Reversed.

A. G. Dickson, of Philadelphia, Pa., for plaintiff in error.

George Demming, of Philadelphia, Pa. (Edgar W. Lank, of Philadelphia, Pa., on the brief), for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge. The plaintiff sued for injuries sustained near a grade crossing at South Bethlehem, Pennsylvania, on the evening of May 27, 1912. Birch street, a somewhat narrow street in that city running in an easterly and westerly direction, crosses the tracks of the Reading Railway Company, which runs in a northerly and southerly direction. These tracks consisted of two main tracks and some sidings east and west of them, which also crossed Birch street. No one other than the plaintiff saw the accident itself, by which he was injured.

The plaintiff testifies that he was proceeding on the sidewalk of the southerly side of Birch street, from the easterly side of the railroad tracks towards the westerly side, and was struck by a box car

that was coming in a southerly direction on a side track, which was the first track he stepped upon in attempting to cross the railroad. This side track was used by the defendant company for its own purposes on that evening, as upon many previous evenings, presumably pursuant to an understanding for track privileges with the Reading Railway Company. The main lines of the Reading Railway cross Birch street between the sidings, east and west, referred to, and the siding on which the accident happened is the one which Birch street first crosses from east to west. The plaintiff testifies that when he stepped upon this track, he suddenly became aware of a box car moving in a southerly direction, so near that he was compelled to catch hold of it and endeavor to save himself, and was dragged some distance before he fell beneath the wheels and suffered the injuries complained of. He testifies that there was no light upon the box car, that no whistle was blown, no bell was ringing, and that it was coming at a high rate of speed.

There was testimony on behalf of the defendant that on the evening in question, at the time of the accident, defendant's shifting engine, with one box car ahead of it, was pushing the same in a southerly direction on this siding across Birch street; that the car was being pushed at a reasonably slow rate of from four to six or seven miles an hour; that the engine bell was continuously rung as it approached and went over the crossing of Birch street; that the conductor and brakeman were sitting on the top of the car nearest the engine, with a lantern. This was the testimony of the engineer, fireman, the conductor and the brakeman on the car, who stated positively that the bell was ringing as the crossing was approached, and that the safety gates were down as they made the crossing. There was also independent testimony from two witnesses, that the gates were down when the car was pushed over the siding; also from the gatekeeper in the employ of the Reading Railway Company, whose tower was on the opposite side of the railway.

There was the not unusual conflict of testimony as to the ringing of the bell, the speed of the train, and the gates being down. There was also circumstantial evidence tending to support the inference that the plaintiff had crossed, not from the pavement on the left hand or southerly side of Birch street, but from a point a number of feet to the south thereof, and not on the crossing. There was the testimony also of four witnesses who saw plaintiff as he came down Birch street toward the railway, and only a short distance therefrom, that he was behaving and staggering like a drunken man. The plaintiff denies that he was drunk, or that he had had more than two glasses of beer that evening. These witnesses testified, and the plaintiff also admitted, that when he came to the corner of Birch street and the railway, he turned to the left, around a large building situated on the corner and about five feet from the siding in question. These witnesses testified that they did not see him return, but the plaintiff testified that he did return to the sidewalk on Birch street before he attempted to cross the track. The point where he was found lying after his injuries was on this siding, about forty feet from the crossing.

The safety gates were owned and operated by the Reading Railway, and were used for the protection of this Birch street crossing, as to the movement of trains on all tracks crossing said street, and the defendant's testimony tended to show that they were so used on the night in question, and just before the accident, to protect those using the crossing from the box car and engine that were pushed southward on the siding, and in the movement of which the accident complained of occurred.

The case was submitted to the jury on the issues of the negligence of the defendant and of the contributory negligence of the plaintiff. The jury rendered a verdict in favor of the plaintiff, and to the judgment on this verdict this writ of error has been sued out by the defendant.

The assignments of error are confined to certain exceptions taken to the charge of the court in submitting the case to the jury. Though the assignments are numerous, covering in detached portions almost the whole charge, we will refer only to those which seem to us important by reason of their direct bearing on the questions of the negligence of the defendant and the contributory negligence of the plaintiff.

The gravamen of plaintiff's charge against the defendant was, of course, its alleged negligence in the manner in which the shifting engine and box car made the crossing at Birch street. According to this charge, the negligence consisted of the alleged unreasonable high speed, the absence of any light on the box car, and failure to sound bell or whistle on approaching the crossing, or give other reasonable warning to those about to cross of the approach of the engine and car. It can hardly be said that there was any real conflict of testimony as to the speed of the train. All of those who were in a position to know and qualified to estimate the speed of a train testified to six or seven miles an hour. The only conflict with this, if conflict it be called, is the testimony of the plaintiff himself, who testified that the car, when it bore down upon him, was coming fast,—how fast, he did not attempt to say. The question, however, was submitted to the jury, whether six or seven miles was a reasonable speed at which, under the circumstances, to make the crossing. So also the questions as to whether there was a light on the car, and whether the bell was rung,—for it was admitted that no whistle was blown—were submitted to the jury. If this were all, no exception could be taken to their submission, as questions of fact, to the jury, the finding as to any or all of which would be determinative of the negligence of the defendant.

[2] Another element, however, too important to be ignored, entered into the case, and that was the position of the safety gates at this crossing on Birch street. The only conflict of testimony here again, is between that of the plaintiff, who says that the gates were not down when he attempted to cross, and that of the other witnesses on the engine and car, who declared that the gates were down as they made the crossing, and of independent witnesses who testified that the gates were down before the car touched the crossing. It was in testimony, and not contradicted, that when the gates were being lowered, warning

bells or gongs attached to the same commenced to ring and did not stop until the gates came to their position of rest across the street. It was also testified to by a girl 17 years of age, who was in her room in the third story of a building very near the railroad crossing, and the windows of which looked out upon the same, that she heard these bells ringing, indicating the lowering of the gates, before the car reached the crossing and that they were already down when the car crossed Birch street. Counsel for the plaintiff claims that certain discrepancies were shown in the testimony of this and other witnesses, in regard to the position of the gates; all of which went to the jury, but it is contended by counsel for the defendant that an instruction that clearly tended to eliminate from the minds of the jury the importance of the question, as to whether the gates were up or down when the defendant crossed Birch street, was given.

[1] That safety gates, properly operated, at railroad crossings have become the most important precaution that has been devised for the safety of those using a street or highway across railroad tracks, is a matter of common knowledge and of every day experience. The whistle or bell may not be heard or attended to. Various circumstances may prevent an approaching train from being seen or being regarded by one exposed to its danger, but the peremptory warning and physical obstruction of the safety gate prevents any but the most foolhardy from attempting to cross while they are down. Not only does the presence or absence of such safety gates in this case bear upon the primary question of the defendant's negligence, but it also has a bearing upon at least one other question in the case, viz., whether six or seven miles an hour was undue or unreasonable speed under the circumstances. It seems perfectly obvious that a train may safely and in the exercise of due care, use a higher rate of speed at a crossing guarded by safety gates, than at one at which no such safeguard exists. If, as a matter of fact, these safety gates were in their proper position to protect the crossing at the time the car propelled by the engine entered upon Birch street, and the car and engine were moving at no more than six or seven miles an hour, the jury might well conclude that the railway company was guilty of no negligence in the premises, having taken the most efficient precaution in giving warning to those about to enter upon the crossing. Of course, whether the gates were really down in time to prevent the accident, or not, was a question for the jury to determine, who would take into consideration all testimony which tended to impugn the veracity or accuracy of the witnesses, in regard to the position of these gates, but the question as to their position in due time to give warning to those about to cross the track, was as important as, if not more important than, any other in the case. The part of the charge touching this matter, to which exception is taken by the defendant, is as follows:

"Now, the testimony on the part of the defendant is that there was a safety gate there, and that it was operated by the Philadelphia & Reading Railway Company, which company employed the watchman at the tower to operate the safety gates. There is testimony on the part of the defendant's witnesses that the safety gate was down and that the bell was ringing as the train was approaching. The operation of the safety gates, so far as the testimony shows,

was no exercise of care on the part of the defendant, but if the safety gate was down and the bell was ringing as the train approached, that would be a warning to the plaintiff that a train was approaching, and if he had that warning and disregarded it, he would be guilty of contributory negligence in going upon the track."

This is the only reference in the main charge made by the court below to the safety gate. It is contended by counsel for the plaintiff that the learned judge of the court below, in saying that "if the safety gate was down *and* the bell was ringing as the train approached, that would be a warning to the plaintiff," was referring to the bells or gongs attached to the safety gate or gates, which it was testified sounded as they were being lowered. That does not seem to us to be the natural inference to be drawn from the language of the charge, as quoted. Nowhere else in the charge does the learned judge refer to the safety gates or the bells or gongs attached thereto. In fact, in the first part of his charge, stating the duty imposed upon a railroad to give notice of the approach of trains, there is this language:

"Now, the evidence in this case on behalf of the plaintiff is that there was no bell rung on that train, and that it was going at a high rate of speed, although he does not attempt to estimate the rate of speed. If that was the case, and he went lawfully upon the tracks, doing his duty, in avoiding any risk, as far as he reasonably could, then the railroad company would be guilty of negligence in the case. The duty on the part of a pedestrian, or any one crossing a railroad track, is to stop, look and listen. The plaintiff has testified that he did stop, that he looked both ways, that he did not see any train approaching, and that he listened and did not hear the sound of an approaching train, and then went upon the track. If that is true, and if the crew of the train were not giving any signals, either by a bell or by a light on the train, so that he did not have any warning, such warning as a person should have, and which you find in your judgment should have been given under the circumstances in this case, at a crossing of that sort, then the railroad company would be liable for its negligence, in causing the injury to the plaintiff."

We think, therefore, we are justified in saying that the natural impression made upon the minds of those to whom this charge was addressed, would be that the bell referred to was the one which the judge had said it was the duty of the defendant to have rung as the train was approaching, and it seems to us altogether probable that the jury should have received from the language we have quoted in regard to the safety gate, the impression that the fact that it was down could not be taken into consideration, unless the bell on the approaching engine was also rung.

At the close of the charge, the following colloquy took place between counsel for the defendant and the court:

Mr. Dickson:

"I also wish an exception to that part of the charge in which your honor stated that if the evidence of the plaintiff was believed, that no bell had been rung, and that the train was going at a high rate of speed, the defendant would be liable, in view of the fact that that omits any reference to a gate, if the gate was down. You said that, I think, on one or two occasions, in different parts of the charge."

The Court:

"Gentlemen, what I intended to state to you, and I think I did, was that if there was no warning given to this plaintiff, either by ringing the bell or

having a light on the train or some other warning of the approach of the train, if you find that under the circumstances of this particular case such warning was necessary for the safety of persons crossing the track, if you find that there was no bell rung, and no light on the train, and that that was necessary under the circumstances of this case, then the defendant would be guilty of negligence. There was no evidence in the case that the defendant had anything to do with the placing of gates there or the operation of gates. I have instructed you that if the gate was down and the bell was being rung, that that would be a warning to the plaintiff, and the plaintiff had no right to go on the track if those things existed. If he did, he would be guilty of contributory negligence. I decline to charge the jury that that would be an exercise of care on the part of the defendant, as to the operation of the gates, because there is no evidence showing that the defendant had anything to do with them."

It thus seems apparent that the court used language which might fairly be construed by the jury as instructing them that the question of the negligence of the defendant depended upon the facts, whether the engine and car were moving at a high rate of speed and without the ringing of any bell; or, in other words, that due care on the part of the defendant depended upon whether the bell was rung and the speed slackened as the engine approached the crossing. This practical elimination of the safety gate from the consideration of the jury is emphasized by the language above quoted, viz.:

"The operation of the safety gates, so far as the testimony shows, was no exercise of care on the part of the defendant, but if the safety gate was down and the bell was ringing as the train approached, that would be a sufficient warning," etc.

Unless justified, this language and that last above quoted, viz.:

"I decline to charge the jury that that would be an exercise of care on the part of the defendant as to the operation of the gates, because there is no evidence showing that the defendant had anything to do with them"

—clearly suggests to the jury that, owing to the fact of these gates being operated by the Reading Railway, and not by the defendant, their presence or absence had no bearing on the safety of the situation, for which the defendant was responsible.

Such a suggestion was clearly prejudicial to the defendant, and we think lacks justification. It certainly could make no difference as to the safety or danger of the situation at the Birch street crossing, whether the safety gates were operated by the defendant company or by the company whose tracks it was using. The only real question for the jury was, whether the defendant was using all the care that the situation demanded, and the most important factor in that situation was the presence or absence of a safety gate in its proper position to give due warning to those about to cross the railroad.

For these reasons, it seems clear that there was harmful error in those portions of the charge to which we have referred, and that the judgment below must therefore be reversed and a venire de novo awarded. And it is so ordered.