[Civ. No. 19920. Second Dist., Div. Two. Sept. 24, 1954.]

JAMES FREDERICK STOUT et al., Appellants, v. SOUTHERN PACIFIC RAILROAD COMPANY (a Corporation) et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

[Civ. No. 19221. Second Dist., Div. Two. Sept. 24, 1954.]

JO ANN RUSSELL et al., Appellants, v. SOUTHERN PACIFIC RAILROAD COMPANY (a Corporation) et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

Samuel P. Young for Appellants.

C. W. Cornell, O. O. Collins, John R. Allport and Clyde C. Beery for Respondents.

FOX, J.—In these two consolidated wrongful death actions, plaintiffs (in the Russell case, the widow and five minor children; in the Stout case, the widow and two minor children) appeal from a judgment entered upon a jury verdict denying them recovery from defendant Southern Pacific Company and its motorman, defendant F. P. Kistler, for the deaths of James B. Russell and Fred Stout as the result of a collision between the railroad company's train and an automobile driven by Russell, in which Stout was riding.

The sole question to be passed on is plaintiffs' contention that the trial court, in giving and in refusing to give certain instructions, committed prejudicial error. We have concluded that this contention must be sustained.

The fatal collision occurred on August 4, 1951, at about 6:45 p. m., while it was still daylight on a clear day. The impact took place at a point where a private roadway traverses a right of way owned by the defendant company. This private crossing was used by invitees of Western Cattle Feeders, who maintained a livestock feeding area known as Yard 2, in Puente, Los Angeles County. The decedents Russell and Stout were employees of Western Cattle Feeders at Yard 2.

The salient physical features of the general locale of the accident are as follows: Running parallel to, and approximately 110 feet north of the northern perimeter of Yard 2 is Valley Boulevard, a through highway going east and west. Situated in the area between Yard 2 and Valley Boulevard is defendant company's right of way, upon which it maintains two tracks. The track closest to Valley Boulevard is the main line track, which accommodates passenger and freight trains traveling both east and west. The other track, which is nearer Yard 2, is a siding to which defendant company's trains are shunted when necessary to allow the passage of a train on the main track.

Near the center of Yard 2 and adjacent to its northern border stands a feed barn. At a distance of approximately 25 feet to the west of this barn is located the private crossing previously referred to, which proceeds in a northerly direction across both the siding and main track until it conjoins Valley Boulevard. Approximately one-quarter mile to the east of this crossing, defendant company has erected a "whistle post," at which point the company rules require that the sounding of the air horn on westbound trains be commenced as a warning of the train's approach. It is admitted that there existed no mechanical or physical warn-

ing devices, such as a wigwag or light, at or near this crossing, and that no flagman was stationed there.

Shortly before the occurrence of the accident, Russell was driving his automobile in a northerly direction over the crossing which passes over the tracks. Stout was sitting beside him in the front seat. As the automobile neared the first set of rails (the siding track), an eastbound freight train, about 4,000 feet long, was in the process of traveling slowly over the private crossing along the siding. Russell's automobile was brought to a halt facing north about 10 feet from the moving freight train.

While the freight train was thus moving along the siding between 5 and 10 miles per hour the view from the Russell car to the main line track on the west was obstructed. Along this main line track, a westbound passenger train, drawn by a steam-engine, was proceeding towards the crossing, 22 hours behind schedule. The evidence as to its rate of speed was in conflict. Defendant Kistler, the engineer, testified that the train was traveling 65 to 67 miles per hour up to the time of the accident. A witness for plaintiffs testified to a statement made by the conductor at the scene, that the train was doing 75 miles an hour when the accident happened. A rule of the defendant company prohibits this train from exceeding a speed of 70 miles at the particular crossing here involved. The evidence was sharply in conflict as to whether or not the headlight on the engine was burning and whether or not a bell or whistle was being sounded on the approach to the crossing. Several witnesses for defendant, all of them crew members of its trains, testified the whistle was blown as required as the train approached the crossing, and that the bell on the train had been clanging continuously for miles. Witnesses called in behalf of plaintiffs testified they heard neither a whistle nor a bell in operation, and that they had observed the headlight was not burning.

Two of the crew members in the rear caboose of the freight train testified that the westbound engine passed their caboose at a point about 400 feet east of the private crossing at Yard 2. Engineer Kistler, who was seated on the right side of the cab at the rear of the engine, testified he was observing conditions along the track from his position but did not specifically look to his left, and that he did not see the car prior to the collision. Police officers testified he informed them the decedent's automobile appeared suddenly on the crossing before him. Mr. Martin, the fireman, was seated

on the left side of the cab and could normally be expected to observe traffic approaching from the south (his left). He testified that as the engine approached the crossing the freight train obscured his view of the crossing to the south of the siding. When the caboose drew abreast of the engine, which Martin estimated to have occurred some 250 feet from the crossing, he was able to get an unobstructed view of the entire crossing to his left. It was then that he first observed decedents' automobile moving north at about 6 or 7 miles an hour. Martin testified he realized that the automobile would not stop and that it couldn't "clear" the rails; that he yelled to Kistler "to hold 'em hard"; that Kistler immediately applied the brakes to effect an emergency stop; that he observed the automobile "bucking" along the crossing, and when it was between the siding and the main line "it sort of made a shot—it seemed like it grabbed hold of itself and just made a shot right in front of our train"; that while he did not witness the actual collision he knew that an impact had occurred, "because it was too close."

Domenic Milanesio, a disinterested witness who worked on a farm to the east of Yard 2, adjoining the south side of defendant company's right of way, testified that just prior to the accident he was sitting in his truck at a crossing 1,234 feet to the east of the crossing here involved, waiting for the eastbound freight train in the siding to pass so that he could proceed north over the right of way. His truck, with the window open on the left side, was stopped 10 feet to the south of the siding, from which position he looked to his right and observed the engine of the westbound passenger train about 2 miles away. Upon looking to his left, he saw the stationary Russell automobile facing north on the Yard 2 crossing, about 10 feet from the freight cars. Milanesio testified he saw the top of the westbound engine as it began to pass the freight cars before him; that as the engine passed his location he observed that the caboose of the freight train was to the east of the Yard 2 barn, a structure 300 feet in length; that about then, the Russell automobile started to move north towards the siding at about 5 miles per hour, at which time his observation of it ceased; that from the time he first saw the westbound train 2 miles away up to the time of the accident he heard no bell, air horn, or steam whistle sounded, although his motor was shut off and he was listening. Under cross-examination Milanesio stated that he was accustomed to the going and coming of trains on the

tracks near his farm and there were occasions when he paid no attention as to whether passing trains sounded auditory warnings; that at the time in question it was not important to him whether the bell was rung or the whistle blown.

Plaintiffs' principal contention is that the court committed reversible error in giving to the jury an instruction which extended to defendants the benefit of the disputable presumption that they had exercised due care. (Code Civ. Proc., § 1963, subd. 4.) On this subject, the court gave the following modified instruction requested by defendants: "At the outset of this trial, each party was entitled to the presumption of law that every person takes ordinary care of his own concerns and that he obeys the law." This statement was immediately followed by an instruction in this language: "The law presumes James B. Russell and Fred Stout (now deceased), in their conduct at the time of and immediately preceding the accident here in question, were exercising ordinary care and were obeying the law.

"These presumptions are a form of *prima facie* evidence and will support findings in accordance therewith, in the absence of evidence to the contrary. When there is other evidence that conflicts with such a presumption, it is the jury's duty to weigh that evidence against the presumption and any evidence that may support the presumption to determine which, if either, preponderates. Such deliberations, of course, shall be related to, and in accordance with, my instructions on the burden of proof."

■ It is now firmly established that the presumption that a person has exercised due care is dispelled from the case and is entitled to no probative value when the litigant invoking the presumption has introduced evidence encompassing the subject matter of the presumption. (*Speck* v. *Sarver,* 20 Cal.2d 585, 587-588 [128 P.2d 16]; *Mundy* v. *Marshall,* 8 Cal.2d 294, 296 [65 P.2d 65]; *Barker* v. *City of Los Angeles,* 57 Cal.App.2d 742, 749 [135 P.2d 573]; *Tice* v. *Kaiser Co.,* 102 Cal.App.2d 44, 51-52 [226 P.2d 624].)

■ In consonance with this rule, courts of review have been obliged to point out, in a plethora of cases, that it is erroneous to give an instruction similar in tenor or import to the one first quoted, when thereby the benefit of the presumption of due care is accorded to a party who, by his testimony or by evidence introduced in his behalf, has disclosed his acts and conduct immediately prior to and at the time of an accident. (*Speck* v. *Sarver, supra; Meyers* v. *G. W. Thomas Drayage*

& *Rigging Co.*, 108 Cal.App.2d 529, 534-535 [239 P.2d 118]; *Verhaegen* v. *Guy F. Atkinson Co.*, 126 Cal.App.2d 442, 444 [272 P.2d 855]; *Rozzen* v. *Blumenfeld*, 117 Cal.App.2d 285, 287 [255 P.2d 850]; *Ford* v. *Chesley Transportation Co.*, 101 Cal.App.2d 548 [225 P.2d 997]; *Cole* v. *Ridings*, 95 Cal. App.2d 136 [212 P.2d 597].)

 The crucial question posed is whether plaintiffs were prejudiced by the reading of the instruction. The last four decisions cited, *supra,* represent recent cases in which it was held that the giving of an instruction similar to the one here under attack constituted reversible error.* Whether the error in the giving of the instruction is or is not prejudicial turns upon the circumstances of the case, including the facts and the remainder of the instructions. (*Speck* v. *Sarver, supra; Ford* v. *Chesley Transportation Co., supra; Rozzen* v. *Blumenfeld, supra.*) From an analysis of the various factors appearing in the record, we have concluded that the giving of the instruction complained of worked serious prejudice to plaintiffs.

In the case of *Rozzen* v. *Blumenfeld, supra,* where the giving of an analogous instruction in favor of a defendant not entitled thereto was held to be prejudicial, the court epitomized the disadvantage sustained by plaintiff thereby in the following cogent language (p. 288): "In determining whether prejudice resulted in a particular case, the vice of the criticized instruction should be kept in mind. The party against whom the presumption is invoked must not only overcome by a preponderance of the evidence the case presented by the opposing party, but must also overcome the presumption, for in the language of the instruction, conflicting evidence must be weighed 'against the presumption, *and* any evidence that supports the presumption, to determine which, if either, preponderates.'" (Emphasis added.)

 Turning first to the Stout appeal, it is manifest that, viewed in the framework of the facts and issues there present, the instruction given extended a striking advantage to defendants. There was adduced no evidence that would support a finding attributive of contributory negligence to Stout, and the jury was instructed "that therefore you shall find that there was no contributory negligence on the part of Fred Stout, deceased." Absent the issue of contributory negli-

*To these may be added *Clary* v. *Lindley*, 30 Cal.App.2d 571 [86 P.2d 920], and *Kelly* v. *Fretz*, 19 Cal.App.2d 356 [65 P.2d 914].

gence, it is clear that the plaintiffs in the Stout case derived no benefit from the instruction on due care. But as to defendants, a different situation prevails. The verdict of the jury is most reasonably explained on the basis of their having exculpated defendants of any negligence. We cannot but assume that in weighing the issue of defendants' negligence, the jury gave some weight to the court's instruction that defendants were clothed with a presumption of due care. Since defendants had already covered the subject matter of the presumed fact by comprehensive testimony as to their conduct, it gave them a decidedly unfair advantage to have the jury told a presumption of due care existed in their favor, and should be weighed as evidence together with other testimony in support of the presumption. Therein lies the basic defect of the instruction. ''The effect of the instruction was to add strength to defendant's claim that it was free from negligence. The considerations pointing to negligence would have to overcome not only those pointing to a contrary conclusion, but also the presumption that the defendant was not negligent.'' (*Ford* v. *Chesley Transportation Co.*, 101 Cal. App.2d 548, 553 [225 P.2d 997]; *Rozzen* v. *Blumenfeld, supra,* p. 288; *Verhaegen* v. *Guy F. Atkinson Co.*, 126 Cal.App.2d 442, 444 [272 P.2d 855].) The error in giving the instruction was clearly prejudicial. Plaintiffs were forced, by the instruction, to overcome not only defendants' evidence that their conduct was free from negligence but also the presumption that defendants were not negligent.

The principles to which we have just adverted are equally controlling with respect to the Russell appeal and likewise necessitate a reversal. Furthermore, in continuing its analysis of the prejudicial effect of the instruction on the presumption of due care, the court in the Rozzen case, *supra,* observes: ''A second vice of the instruction is that it is bound to produce doubt or confusion in the mind of a conscientious juror, when he considers it in the light of other instructions given. In the present case, for example, in explaining the meaning of 'burden of proof' and 'preponderance of the evidence,' the jury was told that 'should the conflicting evidence be evenly balanced in your mind, . . . then your finding must be against the party carrying the burden of proof.' The juror is further advised that 'A presumption is a deduction which the law expressly directs to be made from particular facts. Unless declared by law to be conclusive, it may be controverted by other evidence, direct or indirect; but *unless so*

*controverted, the jury is bound to find in accordance with the presumption.'* Further, the juror is told to decide the case 'solely upon the evidence that has been received by the court, and the inferences that you may reasonably draw therefrom, and *such presumptions* as the law deduces therefrom, . . .' Again, the juror is instructed: 'You are not bound to decide in conformity with the testimony of a number of witnesses, which does not produce conviction in your mind, as against the declarations of a lesser number *or a presumption or other evidence, which appeals to your mind with more convincing force.'* (Emphasis added.)'' The exact language of the instructions referred to in the above quotation appears in the instructions given by the trial court in the instant case.

In the Russell case, the negligence of each of the parties was in issue before the jury and upon these issues of negligence the evidence presented close questions of fact, which would have sustained a finding in favor of either party. Upon plaintiffs rested the burden of proving defendants' negligence by a fair preponderance of the evidence under circumstances where the question of whether defendants had sounded a proper warning of the train's approach to the crossing and whether its rate of speed was a reasonable one in view of the obstructed crossing and the noise of the passing freight train were hotly contested. Defendants had presented a comprehensive description of their conduct in the premises up to the time of the accident. Plaintiffs were entitled to have the jury weigh those facts and reach a decision, unfettered by any presumption in defendants' behalf, as to whether it was more probable than not that the defendants' negligence caused the accident. By the injection of the instruction that the law clothed defendants with a presumption of due care and by the further instruction that this presumption would stand against direct evidence to the contrary and that conflicting evidence must be weighed ''against the presumption and any evidence that may support the presumption,'' there was created an additional element which plaintiffs were required to overcome in sustaining their burden of establishing defendants' negligence. Under the admonition of the court, defendants, who received all the procedural protection to which they were entitled when the burden of proof was placed upon plaintiffs, obtained an unwarranted substantive benefit. To an imponderable degree, the implanting of the presumption in defendants' behalf in the minds of the jury tended to diminish the force of those considerations

pointing to defendants' negligence and increased plaintiffs' burden of presenting preponderating evidence of defendants' negligence.

As the court stated in the Rozzen case, *supra* (p. 291), in language apposite to this appeal: "It appears most likely that the verdict of the jury in this cause was based upon a finding that [defendants] were free from negligence. The erroneous instruction [on the presumption of due care residing with defendants] may well have tipped the scales in their favor in the deliberations of the jury. We cannot assume that the verdict was based upon evidence of contributory negligence, but in determining whether instructions given are correct, 'we must assume that the jury might have believed the evidence upon which the instruction favorable to the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party.' (*Cole* v. *Ridings, supra,* p. 142, quoting *O'Meara* v. *Swortfiguer,* 191 Cal. 12, 15 [214 P. 975].)"

Defendants argue that the criticized instruction merely advised the jury that they were entitled to the benefit of the presumption "at the outset of the trial" while plaintiffs were presumed, in the following instruction, to have exercised due care at all times. There is no merit in this argument so far as it purports to detract from the prejudicial effect of the instruction, the only question here vital. Defendants were either entitled to an instruction on the presumption or they were not, and it is unquestioned that it should not have been given in their behalf. The opening language used is similar to that employed in the cases of *Cole* v. *Ridings, Rozzen* v. *Blumenfeld,* and *Ford* v. *Chesley Transportation Co., supra,* as well as the recent case of *Verhaegen* v. *Guy F. Atkinson Co.,* 126 Cal.App.2d 442 [272 P.2d 855]. Nowhere in the instruction is there any intimation that the presumption so accorded was not to be considered by the jury in its evaluation of defendants' negligence. On the contrary, the instruction does not stand alone, but is supplemented with detailed instructions on the force and effect of presumptions, that a presumption is a form of evidence, and that it will support a finding in accordance therewith. There is no way of telling to what extent the jury was influenced by this presumption of due care in rejecting direct evidence of defendants' negligence or in weighing the presumption against evidence of their negligence. In either

event, plaintiffs' case would not receive the fair consideration to which it was entitled because of the mischievous effect of the instruction.

There is also merit in plaintiffs' contention that the court erred in refusing a significant instruction proffered by them. The court read a single instruction on the issue of the train's speed, submitted by defendants: "You are instructed that there is no statute or ordinance regulating the speed at which the railway company may operate its trains over and across the crossing involved in this case, and therefore the railroad company had a right to operate its trains at any rate of speed consistent with ordinary care, and you are further instructed that a speed of 65 miles per hour, or a greater speed, was not of itself negligence on the part of the railway company." While this instruction is a correct statement of the law so far as it goes, plaintiffs properly point out that in all fairness the jury, having been instructed as to when the speed of the train was not negligent, should have been instructed as to when and under what conditions, supported by the evidence, its speed may be negligent. The court refused the following instruction offered by plaintiffs: "The question of whether or not a rate of speed at a crossing is so dangerous or excessive as to constitute negligence depends upon the particular circumstances there existing; the question as to whether the railway company was guilty of negligence in maintaining such speed is one of fact for the jury."

This latter instruction should have been given. (*Wyseur* v. *Davis,* 58 Cal.App. 598, 602 [209 P. 213].) It states the prevailing rule, almost verbatim, as laid down in *Bilton* v. *Southern Pac. Co.,* 148 Cal. 443, 447 [83 P. 440], a case involving an accident on an obstructed crossing, in the following language: "It is true that, in the absence of any statute or ordinance on the subject, no rate of speed is negligence *per se* . . . However this may be, there can be no doubt that the question as to whether or not a rate of speed at a crossing is so dangerous or excessive as to constitute negligence must depend on the particular circumstances there existing, and if the circumstances are such that reasonable and impartial men may well differ as to whether the speed maintained at the particular place showed a want of reasonable care, the question as to whether the railroad company was guilty of negligence in maintaining such speed is one for the jury."

It must be borne in mind that somewhat unusual

circumstances attended this accident. To begin with, there was a complete absence of any physical barrier or mechanical devices to warn of the approaching westbound train. The testimony of defendants' own witnesses, Kistler and Martin, clearly indicated that they knew of the location of the crossing and were aware that their view of its southern side was obstructed by the eastbound freight train. The freight train, containing about 80 cars, was moving with its characteristic rumble, adding a welter of sound to the vicinity of the crossing. The passenger train approached this obstructed crossing at a speed of 65 to 67 miles per hour.

It is well established that the question of whether or not the rate of speed of a train in passing a crossing is excessive is a question of fact to be considered in relation to the attendant circumstances and the conditions involved. (*Young* v. *Pacific Elec. R. Co.*, 208 Cal. 568, 574 [283 P. 61]; *Bilton* v. *Southern Pac. Co.*, supra; *Tousley* v. *Pacific Elec. R. Co.*, 166 Cal. 457 [137 P. 31]; *Dow* v. *Southern Pac. Co.*, 105 Cal.App. 378, 384-385 [288 P. 89].) In the case last cited, the court states (p. 384): "The fact that the view of one approaching a railroad crossing is obstructed, may make it negligence to propel a train across such a crossing at a high rate of speed." In holding it to be a question for the jury as to whether the rate of speed at an obstructed crossing was negligence, the court made these remarks in *Young* v. *Pacific Elec. R. Co.*, supra (p. 573): "As the standard of duty shifts with the circumstances developed in the case, the question whether or not a rate of speed is excessive is one of fact for the jury." In 154 American Law Reports 212, an annotation dealing with the speed of a train at a crossing, the following statement of the law appears which is here singularly apposite: "Where there is more than one set of tracks at a crossing, and the view down the track on which a train is approaching is obstructed by freight cars or other rolling stock standing on another track, the situation calls for a reduced rate of speed commensurate with the increased danger, in the absence of a flagman, crossing gates, or other safety precautions. And at a crossing where there are two or more tracks, a train on one track may obstruct the view of a second train on another track, and the noise made by one may tend to obscure the warning noise made by the other, in addition to drawing attention from all other matters, thus creating an additional source of danger. Such a situation may be taken into consideration in determining

whether the speed of the train or locomotive causing the injury was negligent." (Pp. 228-229.) As stated in the very case relied on by defendants in support of the instruction given, *Larrabee* v. *Western Pac. R. Co.*, 173 Cal. 743, 749 [161 P. 750] : "The rate of speed of a train, the place and circumstances under which it is traveling, may all be considered by the jurors where no law limits the speed, to aid them in determining whether or not at the place and at the time of the operation of the train its rate of speed was negligent." Plaintiffs were thus entitled to have this instruction, embodying their theory of the case with substantial support in the evidence, presented to the jury. (*Bickford* v. *Pacific Elec. R. Co.*, 120 Cal.App. 542, 548 [8 P.2d 186].) Clearly, neither the single instruction given on speed, nor other generalized and more abstract instructions on standards governing the conduct of a reasonably prudent person constituted a sufficient substitute for the more specific instruction on this branch of the plaintiffs' case as it related to the peculiar circumstances here adduced. "[T]he giving of a general instruction which covers the subject in an abstract way does not justify the refusal of a requested particular instruction correctly applying the law to a specific matter." (*Barnett* v. *Garrison*, 93 Cal.App.2d 553, 558 [209 P.2d 426].)

We are of the opinion that the effect of the instructions erroneously given and refused is such as to remove the case from the purview of section 4½ of article VI of the California Constitution and compel a reversal of the judgment.

The judgment in each case is reversed.

Moore, P. J., and McComb, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied November 17, 1954.