[Civ. No. 22387.   Second Dist., Div. Two.   Dec. 6, 1957.]

JOHN G. HERRERA et al., Appellants, v. SOUTHERN PA-
CIFIC COMPANY (a Corporation), Respondent.

782

James D. Garibaldi, Warren J. Lane, Francis Gherini and John B. Marshall for Appellants.

Griffith & Thornburgh for Respondent.

ASHBURN, J.—Four personal injury actions and one action for wrongful death were consolidated for trial and are presented together upon appeal. The appeals are taken from judgments entered upon verdicts directed for defendant.

There is no claim here that there was contributory negligence and the sole question is sufficiency of the evidence to warrant a reasonable inference of negligence on defendant's part.

As the test of power to direct a verdict is the same

as that for nonsuit, this court must accept as true all direct
and indirect evidence favorable to plaintiff and reject that
opposed to it. (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d
768]; 2 Witkin, California Procedure, § 125, p. 1857.) Many
years ago it ceased to be the rule that a directed verdict was
proper if the evidence "is of a character so conclusive that
the court should in the exercise of its discretion set aside
a verdict not in accord therewith," as stated in *Jacobson* v.
*Northwestern Pac. R. R. Co.,* 175 Cal. 468, 473 [166 P. 3].
In the Lances case, *supra,* it is said: "It has become the estab-
lished law of this state that the power of the court to direct
a verdict is absolutely the same as the power of the court to
grant a nonsuit. . . . Unless it can be said as a matter of law,
that . . . no other reasonable conclusion is legally deducible
from the evidence, and that any other holding would be so
lacking in evidentiary support that a reviewing court would
be impelled to reverse it upon appeal, or the trial court to set
it aside as a matter of law, the trial court is not justified
in taking the case from the jury. . . . In other words, the
function of the trial court on a motion for a directed verdict
is analogous to and practically the same as that of a reviewing
court in determining, on appeal, whether there is evidence in
the record of sufficient substance to support a verdict."
(P. 400.)

On May 24, 1956, at about 6:30 a. m. and in daylight,
plaintiff Herrera was driving his one and one-half ton Ford
truck westerly on Third Street in the city of Oxnard and
crossing the north-south right-of-way of defendant railroad
company. With him were 13 Mexican field laborers whom he
was taking to work. As he approached the crossing Herrera
stopped the truck at a white line opposite the automatic sig-
naling device on the east side of the tracks. He looked for
approaching trains and saw none. The signal was not then in
action and did not start until he was on the third track with
the truck stalled thereon. Plaintiff had to cross five sets of
tracks, the main line being the third or middle one. As he
arrived there his engine stalled, he was unable to start it,
saw a freight train approaching from the north and then tried
to pull the truck off the track by using the starter. He
almost succeeded, but the right front of the engine hit the
extreme rear end of the truck, the rear 30 inches, injuring
plaintiffs Herrera, Salazar, Venegas and Torres, and killing
Jose Leal, whose heirs sue for his wrongful death. All occu-

pants of the truck were able to escape in safety except the persons above named.

Because the track curved to the left, or east, and the view was obstructed by an ice company's loading dock and freight cars standing beside it, the view of the engineer and fireman of the southbound freight was obstructed. When about 700 feet north of the crossing[1] the fireman, who was on the east side of the engine and charged with the duty of keeping a lookout, saw plaintiffs' predicament and informed the engineer, who threw on the emergency brake but was unable to stop the train until it was 611 feet past the point of impact,—almost a quarter of a mile from the point where the brake was applied. This train consisted of 49 loaded cars, a caboose and four diesel engines; exclusive of the engines the weight was 2,453 tons; the four diesels weighed slightly less than a million pounds, or 500 tons; total weight, 2,953 tons. At the north city limits of Oxnard was a sign, posted by defendant, setting a speed limit of 35 miles per hour for first class trains and 25 miles for freight trains. For some undisclosed reason the particular freight train was designated by defendant as first class, which meant it could travel the same speed as a passenger train in towns and cities and in outlying country subject to a maximum of 60 miles an hour in the country districts. The engine speed tape showed a rate of 36 miles an hour with speed increasing at the time the brakes were applied; it was claimed by defendant's employee, who interpreted this record, that it was off to the extent of one mile and the correct reading should be 35 miles, the maximum allowed by the company for any train under any circumstances at that place. Third Street was the most heavily traveled of any of the three which crossed the railroad in that city. There were no gates and no flagman but there were automatic signals with flashing lights and ringing bell, which were actuated by a train when 1,419 feet north of the center of Third Street. As the train approached the engine bell rang continuously for a mile before reaching this crossing, the whistle was blown repeatedly and two headlights were burning—one stationary and the other oscillating—though it was daylight.

Respondent argues: "When a railroad installs gates or automatic signals at a crossing and those signals function perfectly, it should be allowed to run its trains through those crossings at any speed. . . . If automatic signals are installed,

---

[1]The fireman says it was 550 to 600 feet.

then the railroad company, if the signals function properly, should be allowed to run trains at any speed through the protected crossing, and in this case, respondent suggests that a speed of 35 miles per hour through the properly protected Third Street crossing could not and did not constitute negligence in the case here.'' This does not square with modern concepts.

■ ''Generally speaking the duty to exercise reasonable or ordinary care is imposed upon the operator of a railroad at public highway crossings with respect to persons traveling upon the highway and over the crossing, both as to the manner of operating the train and the maintenance of the crossing. The standard of care is that of the man of ordinary prudence under the circumstances. . . . ■ The question of the negligence of the railroad operator is ordinarily one of fact in crossing cases as it is in other negligence cases [citations]. Too frequently appellate courts have ignored those fundamental principles when dealing with railroad crossing accidents, and have arbitrarily substituted their conclusions of law as to the care a man of ordinary prudence would exercise under the circumstances presented to the trier of facts. . . . ■ Where the conditions existing at the crossing create an unusual hazard or danger, the operator of the railroad must exercise care commensurate with those circumstances, and whether he has done so is a question of fact.'' (*Peri* v. *Los Angeles Junction Ry. Co.*, 22 Cal.2d 111, 120, 123 [137 P.2d 441].)

■ The train crew cannot assume that a highway crossing in the middle of a city will be clear and they must keep a reasonable lookout for the presence of intersecting traffic. (*Greene* v. *Atchison, T. & S.F. Ry. Co.*, 120 Cal.App.2d 135, 139 [260 P.2d 834, 40 A.L.R.2d 873] ; *Keiper* v. *Northwestern Pac. R.R. Co.*, 134 Cal.App.2d 702, 711-712 [286 P.2d 47, 288 P.2d 262] ; *Staggs* v. *Atchison, T. & S.F. Ry. Co.*, 135 Cal. App.2d 492, 500 [287 P.2d 817] ; *Jansen* v. *Southern Pac. Co.*, 112 Cal.App.2d 833, 843 [247 P.2d 581] ; 22 Cal.Jur. § 58, p. 304 ; 74 C.J.S. § 738, pp. 1379-1380.) This implies as a corollary the further obligation to have the train under such control as may be reasonably necessary to deal with situations which an ordinarily prudent operator would anticipate. ■ Foreseeability is the test of responsibility for injuries to another; not the foreseeing of the exact circumstances involved in a particular accident, but the probability of some injury to another as a result of the conduct under investiga-

tion. "It is an elementary principle that negligence is gauged by the ability to anticipate danger. '[R]easonable foresight of harm is essential to the concept of negligence, and supplies the criterion for determining whether it exists in a particular case, and reasonable foreseeability of harm is the fundamental basis of the law of negligence.' " (*Tucker* v. *Lombardo*, 47 Cal.2d 457, 464 [303 P.2d 1041].) "The precise consequence of a wrongful act or omission need not have been foreseeable. The question is not whether defendant did foresee, or by the exercise of ordinary care should have foreseen, the identical consequence that happened, in order that its act or omission be a proximate cause of the injury or damage. The question is whether it was reasonably foreseeable that injury or damage would likely occur. Defendant's duty is measured by the standard of foreseeability of injury or damage to the eyes of a reasonably prudent person having regard for the accompanying circumstances." (*Osborn* v. *City of Whittier*, 103 Cal.App.2d 609, 615, 616 [230 P.2d 132].) To the same effect, see *Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 216 [157 P.2d 372, 158 A.L.R. 872]; *Wallack* v. *Bass*, 105 Cal.App.2d 638, 643 [234 P.2d 160].

█ The question of whether probability of injury to another is reasonably foreseeable is ordinarily a question of fact. (*Mosley* v. *Arden Farms Co., supra*; *Osborn* v. *City of Whittier, supra*.) █ The installation and maintenance of automatic signals does not relieve a railroad company of this duty of keeping a reasonable lookout for other traffic. (*Peri* v. *Los Angeles Junction Ry., supra*, 22 Cal.2d 111, 126; *Bush* v. *Southern Pac. Co.*, 106 Cal.App. 101, 107 [289 P. 190].)

A train cannot be driven through the crossing within a city regardless of the presence of vehicles or pedestrians thereon. One whose vision has been obscured and hearing impaired by a passing train on a nearer track may often be led into a perilous position; a heavily laden and slow moving truck which enters the right-of-way just ahead of wigwag activity, one whose vehicle becomes unfortunately stalled on the track, a pedestrian who is old or lame and slow, may be caught in a predicament which needs the help of a train crew to extricate him or it. It is not a question of law whether the train crew should foresee all or any of these eventualities. It is a question of fact for the jury to determine in the light of the particular situation which gave rise to the accident.

█ The proposition that a railway company may run its

trains over street crossings in towns and cities at such speed as it desires is an exploded theory so far as this state is concerned. *Young* v. *Pacific Elec. Ry. Co.,* 208 Cal. 568, 572 573 [283 P. 61] : "While it is true that no rate of speed is negligence *per se* in the absence of a statute or ordinance, it does not follow that a railroad company will be permitted to run its trains under all conditions at any rate of speed it may choose. It must regulate its speed with proper regard for the safety of human life and property, especially when running through towns and cities. The character of a crossing, it has been well reasoned, affects the duty of the railroad company toward travelers upon the public highway, and its trains must pass over dangerous crossings at a less rate of speed proportionate to the danger. As previously stated, the scene of the collision was not the ordinary country grade crossing, but a well-traveled, paved avenue within the city limits. . . . As the standard of duty shifts with the circumstances developed in the case, the question whether or not a rate of speed is excessive is one of fact for the jury." *Johnson* v. *Southern Pac. Co.,* 105 Cal.App. 340, 350, 351 [288 P. 81] : "So far as this case is concerned, there is neither statute nor ordinance limiting the speed of trains. However, that does not open the gates wide for the running of trains through a populous city, or a city no larger than that of Chico, estimated to have a population of about 14,000, at such a high rate as to render it dangerous and a negligent act in and of itself. In some states,[2] as set forth in Ann. Cas. 1914B, page 602, the general rule is that in the absence of a prohibitory statute or ordinance, a railroad company may ordinarily run its trains at such speed as it sees fit, and that a charge of negligence cannot be predicated on the rate of speed at which a train is run, unless there are attendant circumstances which makes such speed negligence. (Citing a long list of cases.) Further, on page 603 of the same volume, the modern rule is thus stated: 'The recent cases are in accord with the general rule that while no rate of speed is of itself negligence, it may be negligence to run a train at a high rate of speed through a populous community and over a much-frequented crossing.' (Citing a long list of cases.) . . . Whether the speed of a train in approaching a crossing is so dangerous or excessive as to constitute negli-

²Respondent relies upon two Pennsylvania cases: *Custer* v. *Baltimore & O. R. Co.* (1903), 206 Pa. 529 [55 A. 1130]; *Central R. Co. of New Jersey* v. *Hudson* (3d CCA; 1913), 209 F. 176 [126 C.C.A. 124].

gence, is a question for the jury, has been likewise held in the following cases: *Badostain* v. *Pacific Elec. Ry. Co.*, 83 Cal. App. 290 [256 P. 576]; *Bilton* v. *Southern Pacific Co.*, 148 Cal. 443 [83 P. 440]; *Tousley* v. *Pacific Electric Ry. Co.*, 166 Cal. 457 [137 P. 31]. The latest case holding that negligence in relation to the speed is a question for the jury is that of *Young* v. *Pacific Electric Ry. Co.*, 208 Cal. 568 [283 P. 61], where the cases which we have cited are approved, and a quotation therefrom is set forth to the effect that whether the rate of speed at a crossing is so dangerous or excessive as to constitute negligence must depend upon the circumstances and the conditions involved, etc., which must be determined by the jury."

To the same effect, see *Dow* v. *Southern Pac. Co.*, 105 Cal. App. 378, 384 [288 P. 89]; *Nelson* v. *Southern Pac. Co.*, 8 Cal.2d 648, 652 [67 P.2d 682]; *Stout* v. *Southern Pac. R.R. Co.*, 127 Cal.App.2d 491, 502 [274 P.2d 194]; *Merlino* v. *Southern Pac. Co.*, 132 Cal.App.2d 58, 66-67 [281 P.2d 583].

The company-imposed maximum speed of 35 miles for the train in question does not have the force of law, but it is a maximum rate and an admission on the part of defendant that any higher speed would be improper in that immediate locality. (*Davis* v. *Johnson*, 128 Cal.App.2d 466, 472, 473 [275 P.2d 563]; *Powell* v. *Pacific Electric Ry. Co.*, 35 Cal.2d 40, 46-47 [216 P.2d 448].) It was for the jury to say whether the prescribed rate of 35 miles was too high for this busy intersection; whether a 25-mile limit or a 10-mile limit would not be the proper maximum, especially for a heavy freight train; whether the accident would not have been obviated had such lower speed been pursued on the occasion in question; whether the obstructions to the fireman's and engineer's view did not demand a substantial reduction below the company prescribed maximum; whether the fireman and engineer did act as promptly as they should have done. In the following cases it was held, under circumstances similar to those at bar, that a question of fact was presented as to the railway company's negligence: *Barton* v. *New York, New Haven & Hartford R. Co.* (Mass.), 125 N.E.2d 125; *Schaaf* v. *Coen*, 131 Ohio St. 279 [2 N.E.2d 605]; *Missouri Pac. R. Co.* v. *Hanna*, 168 Miss. 867 [152 So. 282]; *Broad* v. *Pennsylvania R. Co.*, 337 Pa. 478 [55 A.2d 359]; *Pennsylvania R. Co.* v. *Ackerson*, (6 Cir.) 183 F.2d 662.

We do not suggest that a jury verdict in favor of defendant would not have been sustained by the evidence, but

we are compelled to hold that the granting of the motion for directed verdict was prejudicially erroneous.

The judgment in each case is reversed.

Fox, Acting P. J., and Richards, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.