Argued March 6, reversed and remanded September 10, 1973

KOCH, *Respondent, Cross-Appellant, v.*
SOUTHERN PACIFIC COMPANY,
*Appellant, Cross-Respondent.*
513 P2d 770

*James H. Clarke,* Portland, argued the cause for appellant, cross-respondent. With him on the briefs were Wayne Hilliard, and McColloch, Dezendorf, Spears & Lubersky, Portland.

*Burl L. Green,* Portland, argued the cause for respondent, cross-appellant. With him on the briefs were Green, Richardson, Griswold & Murphy, John J. Haugh, and O'Connell, Goyak & Haugh, P. C., Portland, and William G. Wheatley, and Jaqua, Wheatley & Gardner, Eugene.

Before McAllister, Presiding Justice, and

Denecke, Holman, Tongue, Howell, and Bryson, Justices.

HOLMAN, J.

This is an action brought by plaintiff, through his guardian, for damages for personal injuries suffered when an automobile in which he was a passenger was struck by defendant's train at a grade crossing. Defendant Southern Pacific appealed from a judgment for plaintiff entered pursuant to a jury verdict.

The accident occurred during daylight at the intersection of Thurston Road and defendant's railroad track near the city of Springfield in Lane County. Thurston Road is a narrow, two-lane, hard-surfaced country road which runs north and south. Defendant's track runs in a southeasterly direction and is approached from the north by Thurston Road at approximately a 30-degree angle. At the point where Thurston Road and the track converge, the road turns right and crosses the track at almost a right angle. Traffic from the north on Thurston Road was controlled by a warning sign 700 feet before the crossing and by a standard railroad crossbuck and a stop sign at the crossing.

The vehicle in which plaintiff was riding approached the intersection from the north on Thurston Road at a speed of 25 to 30 miles per hour. The driver of the vehicle failed to stop at the stop sign at the intersection with defendant's track and the vehicle was hit broadside by defendant's train which was traveling in a southerly direction at about 50 miles per hour. There was evidence that the train had rung its bell, blown its whistle and that its revolving head-

light was working. There was no evidence to the contrary. Two passengers in the vehicle were killed and plaintiff suffered extremely severe and disabling personal injuries.

The only specification of negligence submitted to the jury was that the crossing was extrahazardous and, therefore, should have been protected by automatic gates and/or automatic signals to keep vehicular traffic off the track while a train was approaching. No charge of contributory negligence was submitted to the jury and no error was assigned for failure to do so.

■ Defendant contends that the trial court erred because it allowed three of plaintiff's expert witnesses to testify that, in their opinion, the crossing was extrahazardous. Defendant argues this was not a proper subject for expert testimony. The matter came before the court each time in approximately the following manner:

"Q I will ask you whether or not you have an opinion as to whether this crossing is so dangerous that the reasonably prudent person cannot safely use it unless measures are taken in excess of those normally used to warn the travelers of the approach or presence of a train?

"A Yes, sir, I have an opinion.

"MR. HILLIARD: I will object to the stating of the opinion.

"THE COURT: On the same ground as before?

"MR. HILLIARD: Same ground as before.

"THE COURT: All right. It will be overruled.

"Q BY MR. GREEN: Will you state your opinion, please.

"A In my opinion this is an extra hazardous crossing as it was described.

"Q In that terminology?

"A Yes, sir.

"Q I will ask you whether you have an opinion as to whether this is the type of intersection that the railroad can reasonably anticipate a motorist using due care would nevertheless be likely to collide with a train at the crossing unless some special warning was provided?

"A Yes, sir, I agree with that and my opinion —

"MR. HILLIARD: I thought—

"THE WITNESS: —I am sorry. You didn't really ask if I had an opinion, Mr. Hilliard? Did you ask me if I had an opinion?

"MR. GREEN: Yes.

"THE WITNESS: Yes, I do.

"MR. HILLIARD: Don't apologize. All I want to do is say I want to make the same objection, Your Honor, on the same grounds.

"THE COURT: Well, you are asking—

"MR. GREEN: I will ask what his opinion is.

"THE COURT: You object on the same grounds. It will be overruled.

"Q BY MR. GREEN: What is your opinion?

"A I have an opinion that the description which you have given, which I can't repeat exactly, well describes this intersection probably better than I can do."

Each time substantially the following objection was made:

"MR. HILLIARD: I would object to the witness giving an opinion on that subject, your Honor. That is not an area of expert opinion. It's something that the witness has agreed he has no experience with the test of the Oregon Supreme Court. This is his first exposure to it.

"That is the question for your Honor or the jury to decide. It isn't a subject that someone as an expert can tell what an ordinary motorist would or would not do under a given situation. It's just impossible for an expert, unless that is an expert that knows as an expert, studies the ordinary careful motorist and knows what he would do when he is exercising ordinary care or not. I just don't see how that could ever be the subject of an expert opinion."

That the question put to the witness was substantially the same as the principal question which was to be decided by the jury does not keep it from being a proper subject of expert testimony. *Ritter v. Beals*, 225 Or 504, 525, 358 P2d 1080 (1961).

■■ The factor which determines if a subject is a proper one for expert testimony is whether the answer of an expert can be of appreciable help to the jury. *Sandow v. Weyerhaeuser Co.*, 252 Or 377, 380, 449 P2d 426 (1969). It depends upon whether the subject is such that the expertise of the witness gives him a special insight superior to that of the average juror. There is no doubt that the experts who testified in the present case had superior knowledge and training concerning railroad crossings and those circumstances which make them dangerous. Thus, it was appropriate for the experts to point out to the jury, as they did, the aspects of the crossing which increased its danger to vehicular traffic and the steps that could have been taken by the railroad to alleviate such danger.

The rationale behind the opinion rule as it applies to experts is expressed in 7 Wigmore on Evidence (3d ed 1940) 10, 11, 12, §§ 1917, 1918, as follows:

"The sum of the history is, then, that the

original and orthodox objection to 'mere opinion' was that it was the guess of a person who had no personal knowledge, and the 'mere opinion' of an expert was admitted as a necessary exception; that the later and changed theory is that *wherever inferences and conclusions can be drawn by the jury as well as by the witness,* the witness is superfluous; and that thus an expert's opinion is received because and whenever his skill is greater than the jury's, * * *." (Emphasis theirs.) 7 Wigmore on Evidence at 10.

While disapproving of almost all limitations on the expression of an opinion by a witness, Wigmore makes the following general statement concerning the rule:

"* * * We are dealing merely with a broad principle that, whenever the point is reached at which the tribunal is being told that which it is itself entirely equipped to determine without the witness' aid on this point, his testimony is superfluous and is to be dispensed with." 7 Wigmore on Evidence at 11.

The practical justification for some rule of limitation is stated by Wigmore thusly:

"* * * The delay and waste avoided might be in a single instance trifling; but its seriousness and its unbearableness can be appreciated if we suppose that there were no evidential limits whatever of the above nature. The time taken in the rehearsal of an interminable multitude of opinions, the confusion of the main issues by an additional mass of testimonial differences and impeachments, and the tendency for the jury now and then to decide simply according to the preponderance of numbers and of influential names,—all these are possibilities, in the absence of some limit of the present nature." 7 Wigmore on Evidence at 11.

█ █ In order for an expert witness to determine whether a crossing is extrahazardous, the witness must

apply the legal standard for such railroad crossings as laid down by this court. An extrahazardous crossing has heretofore been defined as one at which unusual circumstances or conditions exist making it so dangerous that a reasonably prudent person cannot safely use it unless means are taken in excess of those normally used to warn the traveler of the approach or presence of a train. *Brown v. Spokane, P. & S. Ry.,* 248 Or 110, 431 P2d 817 (1967).[1] The application of such criteria by the experts necessarily entailed an evaluation of the degree of care which a reasonably prudent person was capable of exercising, considering the existing dangerous circumstances which had been described in detail.

■ We believe an expert in railroad crossing safety is no more competent to evaluate the capabilities of a reasonably prudent automobile driver than are the court or members of the jury. Such an expert's training and experience give him special knowledge of those situations which tend to cause accidents. In addition, he can predict with some degree of accuracy the relative decrease in the accident rate at crossings which will be realized by the use of different kinds of safety equipment. It is also true that an evaluation of the relative danger of the various conditions surrounding a crossing cannot be made in a vacuum but must, necessarily, be considered in relation to the reactions of motorists who become victims at such crossings. However, insofar as we are aware, there is no indication that the experts possess any special knowledge concerning the degree of care exercised by those who do and do not become accident victims and whether

---

[1] The measures normally used have been held to be the presence of a crossbuck at the crossing, the sounding of the train's bell, the blowing of its whistle, and the use of a headlight.

their conduct did or did not comply with that of that legal fiction, the reasonably prudent man.

Reasonable prudence on the part of the motorist is nothing more than the average ability of the public to act sensibly for its own protection while crossing railroad tracks. As demonstrated by Professors Harper and James, the attributes of a reasonable man involve a community moral judgment[2] about the average individual's ability to foresee an unreasonable risk of injury and to avoid it.[3] The reasonable man is a creature of the law's imagination. He is a legal abstraction. He has the foresight, caution, courage, judgment, self-control, and altruism of the general average of the community and, thus, he represents the general level of moral judgment of the community, what it feels ought ordinarily to be done.[4] The members of the jury, as a cross-section of the public, are considered collectively best qualified to make a community judgment whether such care has been exercised. We, therefore, must hold that the expert witnesses exhausted their expertise when they testified regarding the dangerous circumstances surrounding the crossing and the ways in which those dangers could be alleviated. They had no special knowledge of the propensities of reasonably prudent persons which could have benefited the jury, and error was committed by the trial judge in admitting the testimony.[5]

There are three previous cases in which experts have been allowed to testify whether a condition was

---

[2] 2 Harper and James, The Law of Torts 906, § 16.4.

[3] Id at 907, §16.5.

[4] Id at 902-03, § 16.2.

[5] In Sargent v. Southern Pacific Trans. Co., 264 Or 435, 504 P2d 729 (1972), the expert witnesses testified that the crossing was extrahazardous but no error was assigned.

safe and upon which the dissenting opinion principally relies: They are *Naney v. Lane,* 247 Or 367, 428 P2d 722 (1967); *Ritter v. Beals, supra;* and *Yundt v. D & D Bowl, Inc.,* 259 Or 247, 486 P2d 553 (1971). *Naney* was a case in which an architect was allowed to testify that it was unsafe construction to install a metal strip on stairs which was wider than the rubber matting it held down so that the strip protruded past the edge of the matting. In *Ritter* there was similar testimony concerning the steepness of the pitch at which a wheel chair ramp was built. In *Yundt* this court upheld the denial of admission of expert testimony concerning the permissible height of a metal strip where carpeting ceased and linoleum began as being within the discretion of the court. This ruling necessarily implies that the trial court could have, had it so desired, admitted the offered evidence.

In each of these cases it could not reasonably be expected that the average juror would have the experience in the construction field necessary to determine whether it was prudent to build in the manner in question. No juror could be expected to know whether it was reasonable to build a wheel chair ramp in which the ratio of drop to lateral length was one in four, or whether the extension of a metal strip past the matting which it held down served a useful or beneficial purpose which would make it proper construction practice, or whether there were other and safer ways of joining rug-covered areas and adjacent hard-surfaced floors. No juror is likely to have made a study of the pitch at which a wheel chair can be safely handled or to be familiar with construction practices concerning the laying of matting on stairs or the joining of rug-covered areas and adjacent hard-surfaced floors. A jury can therefore be helped in

such cases by the opinion of one whose business it is to be familiar with such matters.

On the other hand, everyone drives an automobile. Everyone has had experience in avoiding dangers while operating such a vehicle. It is a field of endeavor with which everyone is familiar, and the jurors are as able as anyone else to say when identified and described dangers can safely be coped with by a motorist in the exercise of reasonable care and when they cannot. Insofar as they had any expertise, the experts were allowed to testify, but they had no expertise concerning the exercise of reasonable care by motorists which would be of help to the average juror. There is a basic difference between the average juror's knowledge concerning the operation of a motor vehicle and the average juror's knowledge of building methods and practices.

As we understand the dissenting opinion, it argues that an architect's testimony that certain construction is "unsafe" is the equivalent of testimony that a reasonably prudent person could not use the structure safely in the exercise of reasonable care and, therefore, the architect could testify to the latter as well as to the former. When the architect says that a ramp, floor, or stairs are "unsafe" he is not making a moral community judgment about that legal abstraction, the reasonable man's ability to use the facility in a manner with which everyone is familiar. He is making a professional appraisal of what is considered acceptable conduct by an industry, the operation and ability of which are the subject of expertise not known to the average juror.

In our three previously cited cases in which an architect's testimony was in issue, the expert testified,

in effect, that a reasonably prudent architect or builder would not design or construct a structure as the defendant had. In the instant case the expert was asked (because of the unusual method of determining the extent of defendant's duty), not what a reasonably prudent railroad crossing designer or builder would do, but whether a reasonably prudent automobile driver could safely use the crossing. This is similar to asking a traffic engineer whether 30 miles per hour at a time and place and under certain conditions was a speed at which a reasonably prudent driver would operate his vehicle. It is not the subject of expert testimony.

██ In addition, it was apparent from the testimony of at least some witnesses that they did not fully understand the court's criteria for extrahazardous crossings. They considered as relevant the number of trains using the tracks as well as the number of motor vehicles using the highway in deciding whether the crossing was extrahazardous. It is necessarily assumed that a train is approaching when a person of reasonable prudence attempts to cross the track safely. Otherwise, it could be crossed safely as a matter of course. Therefore, whether one train or one hundred trains use a crossing in one day is immaterial under the definition of an extrahazardous crossing in use at the time of trial. Likewise, whether drivers of automobile vehicles can cross the tracks safely while exercising reasonable prudence is ordinarily not affected by the number of drivers attempting to do so. It is true that the number of accidents at a crossing is related to the number of trains and vehicles using the crossing because the opportunity for collisions is correspondingly increased. However, these statistics throw no light on whether the conditions at a crossing are such that a person of reasonable prudence can cross safely upon

the approach of a train. The number of trains and automobiles using a crossing may actually be relevant to the degree of care which should be required of a railroad to protect the crossing, but, theoretically, these matters cannot be relevant under the criteria now in use.

■ Plaintiff contends that if error was committed it was not prejudicial. The questions propounded to the three witnesses were almost the exact words of the instructions concerning the controlling issue in the case which the court was required to give the jury. The jury was thus told, in effect, by witnesses who qualified impressively, that the witnesses would have decided the case for plaintiff. Thus, there was the possibility of forcing a verdict by the testimony of a number of persons eminent in a related field of endeavor. We cannot say defendant was not prejudiced.

■ The dissenting opinion contends that the admission of the expert testimony which is found objectionable should not be considered prejudicial to the defendant because substantially the same testimony will be admissible when the case is retried under the new rule of reasonable care hereafter made applicable to the railroad. Assuming the dissent's premise concerning future admissibility to be correct, if the admission of the evidence was erroneous and prejudicial to the defendant under the rules used to get the judgment, the prejudice does not disappear because other rules will be used upon retrial under which substantially similar evidence would be admissible.

Plaintiff also contends he was forced into such questioning by the contumacious objections of the defendant to the presentation of proper expert testimony and that the error, if it existed, was thus invited. The

idea that error was invited because the court sustained improper objections to competent testimony, thus making it necessary to use improper testimony, is a novel one. In any event, the contention is not well taken because early in the case plaintiff informed the court and counsel that he intended to have his witnesses testify that the crossing was extrahazardous.

We now must decide whether the case should be sent back for retrial. The defendant contends that the court erred in submitting the case to the jury because the driver's failure to stop at the crossing was the sole cause of the accident and because the crossing was not extrahazardous as a matter of law.

We assume that the driver was negligent in not stopping at the stop sign. No evidence was submitted which in any way excused his failure to do so. The stop sign was plainly visible and he did not stop as the statute requires. However, it does not follow that the driver's failure to stop was *the sole* cause of the accident. People run stop signs because they are negligently unaware of them. They even run stop signs intentionally. However, usually they do not intentionally drive upon a railroad crossing immediately in front of a railroad train unless they are unaware that the train is there. If the driver is unaware of the presence of the train because of the impairment of visibility caused by brush, trees, the angle at which the tracks and the highway intersect, the speed of the train, or a combination of two or more of these reasons and, therefore, ignores the stop sign and drives upon the tracks, such impairment of vision is a cause of the accident as well as the driver's failure to stop at the sign. They are both causes except for which the accident probably would not have occurred. Were it

otherwise, no crossing could be extrahazardous which is protected by a plainly visible stop sign.

■ The plaintiff was not responsible for the driver's negligence and, if there was sufficient evidence of the crossing's extrahazardousness and that such a condition was a cause of the accident, there would be a basis to submit to the jury the question of whether the railroad should have installed adequate signals and/or a barricade as contended by plaintiff. It is the court's opinion that there was sufficient evidence of the crossing's special danger to make the question of its extrahazardousness one for the jury. The highway approached the crossing at an acute angle and there was evidence that visibility between the highway and the track as they converged was substantially impaired by brush, grass, trees and buildings. The track curved about 1,000 feet from the crossing and it was not likely that the train could be seen at all until it rounded the curve. The train was traveling at 50 miles per hour; thus, the jury could find that the driver traveling upon the highway would have less than 14 seconds of impaired vision to see the train approaching at an acute angle.

■ Defendant contends that there was an area of safety adjacent the track from which there was clear vision for 1,000 feet and, therefore, the crossing was not extrahazardous as a matter of law. Defendant cites a number of cases as authority for this proposition.[6] An analysis of these cases indicates that they hold

---

[6] Schwesinger et al v. Hebert et al, 220 Or 149, 348 P2d 249 (1960); McNealy v. Portland Traction Co., 213 Or 659, 327 P2d 410 (1958); Fish v. Southern Pacific Co., 173 Or 294, 143 P2d 917, 145 P2d 991 (1944); Robison v. Oregon-Wash. R. & N. Co., 90 Or 490, 176 P 594 (1919); Cathcart v. Oregon-Washington R. & N. Co., 86 Or 250, 168 P 308 (1917).

that a driver who fails to use such a zone of safety is contributorily negligent. While there is ambiguous language in some of the cases, such language is based upon other cases in which it was held that the driver was contributorily negligent, not that the crossing was extrahazardous. In any event, we do not believe that a railroad should be absolved of all responsibility to give more than the usual warning at an otherwise particularly dangerous crossing just because there is an area immediately adjacent the track where a motorist can see clearly by stopping and peering up and down the track. Plaintiff is entitled to a new trial under the law as it existed at the time of trial.

Plaintiff has invited this court, if retrial is necessary, to abandon the use of extrahazardousness as a criterion for determining the extent of the railroad's duty of care and to replace it with the rule of reasonable care under the attendant circumstances. This court and many others have attempted to classify crossings possessing certain attributes as being extrahazardous as a matter of law, and in such circumstances have imposed upon railroads additional duties to warn of the approach of a train or its presence on the crossing. *See Sargent v. Southern Pacific Trans. Co.*, 264 Or 435, 504 P2d 729 (1972). Crossings which do not possess these attributes are said to be non-extrahazardous and, as a matter of law, no duty is imposed on the railroad other than a crossbuck, sounding a whistle, ringing a bell and the use of a headlight.

In fact, such classifications are another way of saying that, as the danger of a crossing to motorists increases, the duty of the railroad to warn of a train's presence increases. What constitutes ordinary care always increases or decreases depending upon the existing dangers. However, in railroad cases, to a

greater degree than in other kinds of cases, courts have stepped in where only the jury normally treads and have substituted their conclusions of law concerning the care that railroads are or are not required to exercise under various circumstances. This has at times resulted in such astute and penetrating statements as "the train on the track is notice of its presence." The circumstances or combinations of circumstances are so varied that the classification game is doomed to an indifferent success.

It is also apparent that, as the extent and speed of vehicular traffic on highways have increased and, thus, the ability to stop and peer conveniently up and down the track has decreased, this court has held to rigid classifications which sometimes are unduly favorable to railroad traffic and which are not commensurate with present conditions or concepts of due care on the part of motorists.

Other courts have had similar difficulties. The Supreme Court of Michigan was presented with the identical problem in the case of *Emery v. Chesapeake and Ohio Railway Company,* 372 Mich 663, 127 NW2d 826 (1964). The court concluded that, despite statutory safety requirements placed on railroads at crossings (which statutory requirements largely do not exist in Oregon), railroads were also obligated to exercise common law due care for the safety of motorists. The court recognized that it had been mistaken in some of its cases in abandoning the standard of due care and in attempting to require that "special circumstances" exist before railroads must comply with other than the requirements of the statutes. The court stated as follows:

"* * * The rule [concerning the duty of the railroad], *as it is sometimes construed and applied,*

is, indeed, so exceptional that railroads have been excused from compliance with the otherwise universally applicable common law duty of due care, —of ordinary prudence,—the trial judge first having determined *as a matter of law* that there was no 'special duty' \* \* \* imposed upon a defendant railroad to maintain 'special warning' \* \* \* of danger caused by 'special conditions,' \* \* \* 'unusual conditions' \* \* \* or 'special circumstances.' \* \* \* The true rule has sometimes been thus misconstrued and misapplied. \* \* \*

"\* \* \* Unfortunately, some of the language of the Court's opinion in McParlan has been understood erroneously to mean, \* \* \* that only in the event of truly extraordinary circumstances of danger or risk does a railroad have any duty to maintain protective devices at grade crossings in addition to those required by statute and that *the trial judge* is obliged to determine the existence of such extraordinary circumstances before submitting to the jury the question of a railroad's compliance with such duty. \* \* \*" (Emphasis theirs, citations omitted.) 127 NW2d at 831, 832.

In *Sexsmith v. Union Pacific Railroad Company,* 209 Kan 99, 495 P2d 930 (1972), the trial court granted a directed verdict. One of the bases was that the plaintiffs had not sustained the burden placed upon them to establish the crossing as unusually dangerous. In reversing the trial court the Supreme Court of Kansas said:

"\* \* \* We \* \* \* recognized the rule \* \* \* that where unusually dangerous conditions prevail at a railroad crossing the unusual hazard may make additional warnings and precautions by the railroad company necessary. The crux of the matter is simply whether the railroad has afforded users of the crossing sufficient and adequate protection under the reasonably careful person rule. \* \* \*" 495 P2d at 937.

In *Herrera v. Southern Pacific Company*, 155 Cal App 2d 781, 318 P2d 784, 786 (1957), a District Court of Appeals of California cited with approval the following language of the Supreme Court of California in the case of *Peri v. Los Angeles Junction Ry.*, 22 Cal2d 111, 120, 123, 137 P2d 441, 446 (1943):

> " 'Generally speaking the duty to exercise reasonable or ordinary care is imposed upon the operator of a railroad at public highway crossings with respect to persons traveling upon the highway and over the crossing, both as to the manner of operating the train and the maintenance of the crossing. The standard of care is that of the man of ordinary prudence under the circumstances. * * * The question of the negligence of the railroad operator is ordinarily one of fact in crossing cases as it is in other negligence cases [citations]. Too frequently appellate courts have ignored those fundamental principles when dealing with railroad crossing accidents, and have arbitrarily substituted their conclusions of law as to the care a man of ordinary prudence would exercise under the circumstances presented to the trier of facts. * * * Where the conditions existing at the crossing create an unusual hazard or danger, the operator of the railroad must exercise care commensurate with those circumstances, and whether he has done so is a question of fact.' " 318 P2d at 786.

In *Clements v. Atchison, T. & S. F. Ry. Co.*, 124 Okla 13, 253 P 496 (1927), the Supreme Court of Oklahoma recognized that the duty was one of due care and stated as follows:

> "It is not practical for the court to state, as a general rule, the particular acts required on the part of the railway to constitute ordinary care on the part of the latter for the proper safety of the traveler on the public highway crossing, or to state the particular acts required of the traveler for his own safety. The duties resting with each party

depend on the conditions and circumstances relating to each case." 253 P at 498.

For additional cases holding that the duty of the railroad is that of common law due care, *see Pennsylvania Railroad Company v. Mink,* 138 Ind App 311, 212 NE2d 784, 788 (1966) and *Daly v. Illinois Central Railroad Company,* 250 Iowa 110, 93 NW2d 68, 72 (1958).

It is our conclusion that courts should not treat railroad crossing cases in any different manner than any other negligence case. The duty of both railroad and motorist should be that of reasonable care under the attendant circumstances. As in all negligence cases there will be a continuum between no evidence of negligence and evidence of negligence as a matter of law and it will still be the court's duty to take the issue from the jury in cases at the continuum's extreme ends.

Because the retrial of this case will be under the rule of ordinary negligence and the extrahazardous classification will not be used, upon remand the trial court should afford the parties leave to make the requisite amendments in their pleadings. Under the duty of reasonable care now placed upon railroads, the circumstances in which expert testimony will be admissible concerning the condition of a crossing will be determined by whether the condition concerning which the expert justifies involves an expertise which will be of help to the jury.

The case is reversed and remanded for a new trial in conformance with this opinion.

HOWELL, J., concurring.

I concur in the holding in the majority opinion in all respects except I believe that the expert's opinion

in *Yundt v. D & D Bowl, Inc.*, 259 Or 247, 486 P2d 553 (1971) could not be admissible.

TONGUE, J., concurring in part and dissenting in part.

I concur in the holding by the majority that the trial court did not err in denying defendant's motion for a directed verdict based upon its contention that the crossing was not extrahazardous as a matter of law. I also concur in the holding by the majority that "the use of extrahazardousness as a criterion for determining the extent of the railroad's duty of care" in railroad crossing accident cases should now be abandoned by this court and replaced with "the rule of reasonable care under the attendant circumstances," as in other negligence cases.

I dissent, however, from that portion of the majority opinion which holds that the trial court erred in admitting the opinion testimony of expert witnesses upon the issue whether the railroad crossing was extrahazardous and that, as a result, this case must be remanded for a new trial.

In my view, that the fallacy of the reasoning by the majority in arriving at this conclusion is exposed by its concession that the test to be applied in determining whether the opinion testimony of an expert "can be of appreciable help to the jury," and therefore admissible, is "whether the subject is such that the expertise of the witness gives him a special insight superior to that of the average juror" and by the further concession that "there is no doubt that the experts who testified in the present case had superior knowledge and training concerning railroad crossings and those circumstances which make them dangerous."

The majority also quotes with approval from 7 Wigmore, Evidence (3d ed) 10, § 9, as follows:

"* * * an expert's opinion is received because and *whenever* his skill is greater than the jury's * * *." (Emphasis added)

Because the majority concedes that plaintiff's expert witnesses possessed "skill greater than the jury's" it necessarily follows that the opinion of such experts was admissible.

1. *The purported distinction between "extrahazardous railroad crossing" and "unsafe" stairway or ramp in building.*

The majority seeks to escape that conclusion by making a distinction, without support by any cited legal authority, between the opinion of an expert witness that a stairway or ramp in a building is "unsafe" (held by this court to be admissible in *Naney v. Lane,* 247 Or 367, 371, 428 P2d 722 (1967), and *Ritter v. Beals et al,* 225 Or 504, 525, 358 P2d 1080 (1961)), and the opinion of an expert witness that a railroad crossing is "extrahazardous," which the majority would hold to be inadmissible.

The majority would support such a distinction by using the term "extrahazardous" in the context of its legal definition and from the standpoint of the "user," i.e., that an "extrahazardous railroad crossing" is one which a reasonably prudent automobile driver cannot use safely, rather than in the context of "what is considered to be acceptable conduct by [the railroad] industry." At the same time, the majority would use the term "unsafe," as applied to the stairway or ramp in a building, not in terms of the legal definition of "unsafe," much less from the standpoint of the

"user," but in the context of "what is considered acceptable conduct by [the] industry" which designs and constructs stairways and ramps in buildings.

After thus using the terms "unsafe" and "extrahazardous" in two different contexts, the majority would say that a skilled and experienced railroad safety engineer who expresses the opinion that a railroad crossing is "extrahazardous" is making a "moral community judgment" about the ability of a reasonably prudent automobile driver, whereas a skilled and experienced building architect who expresses the opinion that the stairway or ramp is "unsafe" is "not making a moral judgment," but is expressing no more than a "professional appraisal of what is considered acceptable by an industry."

In my view, to make such a purported distinction, and on such a basis, is to engage in legal legerdemain in an attempt to distinguish two concepts which, when viewed in terms of reality, have no substantial difference, at least for the purposes of determining whether the opinion of an expert witness "can be of appreciable help to the jury," so as to require its admission.

It is true, of course, that because this court has previously defined the term "extrahazardous railroad crossing" in terms of whether a reasonably prudent automobile driver could use it safely, the result has been that in designing and constructing a railroad crossing a railroad company could satisfy the duty imposed by that definition by considering the question of its safety solely from the standpoint of the user—and a reasonably prudent user.

By contrast, the duty imposed by law upon one who designs and constructs a stairway or ramp in a

building (and the duty now imposed by this court upon railroads in the planning and construction of railroad crossings) is the duty to use reasonable care under all of the circumstances, without limitation to the anticipation of conduct by users, much less the conduct only of reasonably prudent users. See Prosser, Law of Torts (4th ed) 170-76, § 33.

It does not follow, however, that an expert cannot properly express the opinion that a railroad crossing is "extrahazardous," but can properly express the opinion that a stairway or ramp in a building is "unsafe." Indeed, the term "safe" is usually defined to mean "reasonably safe." 38 Words and Phrases (perm ed) 7 ff. For that reason and because, as previously stated, the duty imposed upon one who designs or builds a stairway or ramp in a building is a duty to use "reasonable care" under all of the circumstances, the opinion of an expert that such a stairway or ramp is "unsafe" is as much, if not more, the expression of a "moral community judgment" relating to what the majority refer to as "that legal abstraction"—the reasonably prudent man. In such a case, however, that "abstraction" is used with reference to the man who designs or constructs such a stairway or ramp, rather than the man who uses the stairway or ramp.

In my opinion, however, the controlling question in deciding the admissibility of the expert opinion testimony in this case is not whether the "legal abstraction" of the "reasonably prudent man" is necessarily involved in both of these two situations. Instead, the controlling question is whether, assuming that it is necessary to consider such a "legal abstraction" in a case involving design and construction of a railroad crossing, any such "abstraction" is of such a nature that the opinion of an expert could not be of any

"appreciable help" to a jury in such a case because the duty of the railroad under the now-abandoned definition of "extrahazardous" was limited under that definition to a consideration of whether a reasonably prudent automobile driver could safely use the crossing.

The majority says that the question asked of this expert witness in this case was "similar to asking a traffic engineer whether 30 miles per hour in a time and place and under certain conditions was a speed which a reasonably prudent person would drive." The majority also says that because "everyone drives an automobile," the question whether a railroad crossing can be used safely by a reasonably prudent driver is not "the subject of expertise not known to the average juror," so as to be a subject on which "the expertise of the witness gives him a special insight superior to that of the average juror."

It is my opinion, however, that even in this age of the automobile, "everyone" has not only had the experience of driving an automobile, but also, and at least occasionally, has had the experience of walking, including the experience of walking on stairways and ramps in buildings. As a result, the "average juror" is just as likely to know whether a stairway or ramp in a building is "safe" or "unsafe" for use by those who enter the building as he is to know whether a railroad crossing can be used safely by reasonably prudent drivers.

The very purpose of the various standards developed by architects in the design of stairways and ramps in buildings is to provide facilities that can be used safely by persons who enter such buildings. Thus, in *Naney v. Lane, supra,* a stairway had been con-

structed with a metal strip along the edge of the steps with an edge about 1/8 or 3/16 of an inch higher than the rubber matting on the steps. An architect was permitted to express the opinion that this was not a "safe design" because a person might catch his shoe on that protruding edge. That testimony by an expert witness with "superior knowledge" was held to be of such possible "help" to the jury as to be properly admissible.

To the same effect, in *Ritter v. Beals et al, supra,* the question whether a ramp constructed in a building for wheelchairs was too steep to be safe for use by persons in wheelchairs was held to be a proper subject for expert opinion testimony that the ramp was "unsafe."

Likewise, in this case, when plaintiff's expert witnesses expressed the opinion that this railroad crossing was "extrahazardous," they were necessarily stating the opinion that the crossing was unsafe for use by reasonably prudent persons. But because they were required to assume the use of the crossing by reasonably prudent persons was no more of a reason to conclude that such testimony by an expert with superior knowledge would not be of "appreciable help" to a jury, so as to exclude such opinion testimony, that it would have been a valid reason to exclude the opinion testimony in *Naney* and *Ritter.*

The reason why the testimony of a person with special training "can be of appreciable help to the jury" in both cases is illustrated by the opinion of the court in *Morgan v. Washington Trust Co.,* 105 RI 13, 249 A2d 48, 51 (1969), in which the doors at the entrance of a bank were designed to swing outward and over a vestibule or platform and plaintiff,

on entering the bank, fell when she "pulled" on one of these doors. In holding that the testimony of an architect was admissible in that case the court said (at p 51):

> "From the pictures which are in evidence, the entranceway to defendant's bank appears to the untutored eye to be perfectly safe. It is only when a trained individual such as plaintiff's architect compares the outward swing of the new doors with the depth of the platform, and when he explains the difficulty encountered by a person of short stature in reaching up and pulling open the door that the hazards that may surround entry into the bank become apparent. * * *."

Similarly, the admission of expert opinion testimony in *Naney v. Lane, supra,* that the raised metal "strip" on the edge of the steps of a stairway was not a "safe design," together with an explanation of the reasons why it was an unsafe design, was consistent with the holdings of the court in *Morgan* and in numerous similar cases.

Because the "untutored eye" of "the average juror" might not have fully understood why persons could not safely use the entranceway to the bank in *Morgan,* the stairway in *Naney,* or the ramp in *Ritter,* the opinions of qualified expert witnesses were held to be admissible in those cases because such opinion testimony was considered by the courts to be "appreciable help" to the "average jurors" in those cases.

In *Yundt v. D & D Bowl, Inc.,* 259 Or 247, 486 P2d 553 (1971), this court quoted with approval from 7 Wigmore, Evidence (3d ed) 21, § 1923, as follows:

> " 'But the only true criterion is: On *this subject* can a jury from *this person* receive appreciable help? In other words, the test is a relative one,

depending on the particular subject and the particular witness with reference to that subject * * *.' " (259 Or at 258)

The court in *Yundt* then held that:

"There are situations, such as *Sandow,* where a jury clearly is not equally well qualified and needs help to find the truth. There are also situations where a jury clearly is equally qualified without help from opinion testimony such as offered here. It is the area between the clearly qualified and the clearly unqualified where the trial judge should be granted a certain latitude of decision in excluding or receiving expert opinion testimony." (259 Or at 260)

This case was tried before an able and experienced trial judge. The majority has expressly conceded that "[t]here is no doubt that the experts who testified in the present case had superior knowledge and training concerning railroad crossings and those circumstances which make them dangerous." The trial judge held, in effect, that under all of the circumstances of this case, including, among other things, the controversy between the parties relating to the extent to which the view of a motorist approaching the crossing was obstructed, the testimony of these well-qualified experts "can be of appreciable help to the jury" in deciding whether this railroad crossing was one which could be used safely by reasonably prudent automobile drivers. In both *Naney v. Lane, supra,* and *Ritter v. Beals et al, supra,* we affirmed trial judges in their exercise of discretion under similar circumstances.

In my opinion, this cannot properly be said to be a case in which "a jury clearly is equally well qualified without help from expert testimony such as of-

fered here." Instead, this is a case in which it should at least be held that the question whether the testimony of plaintiff's expert witnesses "can be of appreciable help to the jury" was "in the area between the clearly qualified and the clearly unqualified," with the result that the exercise of discretion by the trial judge upon that question in this case should be also affirmed.

2. *Any error in receiving expert opinion testimony that the railroad crossing was "extrahazardous" was not prejudicial upon the abandonment of that rule.*

After concluding that it was error to receive in evidence the opinions of expert witnesses upon the question whether this railroad crossing was "extrahazardous," so as to require a new trial, the majority then abandons "the use of extrahazardousness as a criterion for determining the extent of the railroad's duty of care" and holds that:

> "* * * courts should not treat railroad crossing cases in any different manner than any other negligent case. The duty of both railroad and motorist should be that of reasonable care under the attendant circumstances. * * *"

and that:

> "* * * Under the duty of reasonable care now placed upon railroads, the circumstances in which expert testimony will be admissible concerning the condition of a crossing will be determined by whether the condition concerning which the expert testified involves an expertise which will be of help to the jury."

What this appears to say, in a somewhat indirect and ambiguous manner, is that upon the retrial

of this case the admissibility of expert opinion testimony upon the issue whether a railroad crossing is "safe" or "unsafe" will be determined on the same basis as the admissibility of expert testimony whether a stairway or ramp in a building is "safe" or "unsafe."

This court has previously held, in *Naney v. Lane*, 247 Or 367, 371, 428 P2d 722 (1967); *Ritter v. Beals et al*, 225 Or 504, 525, 358 P2d 1080 (1961); and *Yundt v. D & D Bowl, Inc.*, 259 Or 247, 486 P2d 553 (1971), that a trial court may, in its discretion, permit an expert witness with "superior knowledge and training" to express the opinion that a stairway or ramp in a building is either "unsafe" or not designed and built in accordance with good construction practices and safety standards. It must necessarily follow, although not expressly so stated by the majority, that if upon retrial of this case the plaintiff produces the same expert witnesses who, according to the majority, "had superior knowledge and training concerning railroad crossings and those circumstances which make them dangerous" the trial court may properly permit those witnesses to express the opinion that at the time of the accident this railroad crossing was "unsafe" or not constructed in accordance with good construction practices and safety standards.①

What I fail to understand, however, is why, this being so, there was any prejudicial error in the receiving of the testimony of these expert witnesses on the trial of this case, so as to make it necessary to send the case back for a new trial. These witnesses

---

① As stated in Morris, The Role of Expert Testimony in the Trial of Negligence Issues, 26 Tex L Rev 1, 17 (1947):

"* * * [t]he company that undertakes the business of rail transportation has the duty of acquiring and applying adequate technical knowledge to its enterprise. * * *"

testified that, in their opinion, this railroad crossing was not only "unsafe," but that it was "extrahazardous," in accordance with that more rigorous standard now abandoned by this court. In my opinion it necessarily follows that if the crossing was "extrahazardous" it was also "unsafe," in accordance with the far less rigorous standard now adopted by this court.

The majority answers this contention by stating that:

> "* * * Assuming the dissent's premise concerning future admissibility to be correct, if the admission of the evidence was erroneous and prejudicial to the defendant under the rules used to get the judgment, the prejudice does not disappear because other rules will be used upon retrial under which substantially similar evidence would be admissible."

Aside from the fact that, in my opinion, there was no prejudice to the defendant, for reasons previously stated, it is also my opinion that this problem, as presented in this case, is essentially the same as the problem not infrequently presented in appeals to this court in cases in which evidence was either admitted or excluded on a ground which, on appeal, we hold to have been improper. If, upon application of the correct rule, such evidence would have been correctly admitted or excluded, we do not reverse the judgment in such a case and remand it for a new trial on the ground that there was prejudice to the party who had objected to the evidence because of the fact that in ruling upon the objection to that evidence, the trial court had acted under a mistaken impression as to the applicable rule of law.

Indeed, such a result is no more than a corollary of the usual rule that if evidence is admissible for

any purpose a trial court will not ordinarily be reversed for overruling an objection to such evidence even if, in admitting such evidence, the trial court did so for the wrong reason. This result is also consistent with the general rule that where a trial judge makes a proper ruling, but on an improper ground, he will ordinarily be affirmed. See *Bither v. Baker Rock Crushing*, 249 Or 640, 438 P2d 988, 440 P2d 368 (1968). Cf. *Riley v. Good*, 142 Or 155, 158, 18 P2d 222 (1933).

For all of these reasons, I would affirm the judgment of the trial court and therefore must respectfully dissent from the opinion of the majority insofar as it would reverse the judgment of the trial court and remand this case for a new trial.