Argued January 5, affirmed March 25, petition for rehearing denied
April 20, 1976

KOCH, *Respondent,*

*v.*

SOUTHERN PACIFIC TRANSPORTATION
COMPANY, *Appellant.*

547 P2d 589

*James H. Clarke,* Portland, argued the cause for appellant. With him on the briefs were George L.

Kirklin, and Dezendorf, Spears, Lubersky & Campbell, Portland.

*Burl L. Green* of Green, Griswold, & Pippin, Portland, argued the cause for respondent. With him on the brief were John E. Jaqua of Jaqua & Wheatley, Eugene, and John J. Haugh of O'Connell, Goyak & Haugh, P.C., Portland.

Before McAllister, Presiding Justice, and Denecke,* Holman, Tongue, Howell, and Bryson, Justices.

HOLMAN, J.

---

* Denecke, J., did not participate in the decision of this case.

**HOLMAN, J.**

Plaintiff was injured while a passenger in an automobile which was struck by defendant's train at a grade crossing of the railroad and a county road in Lane County. Defendant appeals from a judgment entered pursuant to a jury verdict for plaintiff. This is the second appeal arising out of the same litigation, a prior verdict for plaintiff having been reversed by this court[1] and the initial retrial having resulted in a mistrial.

The vehicle in which plaintiff was riding was being operated on Thurston Road. Thurston Road approached defendant's tracks at an acute angle and immediately prior to the intersection made a sharp turn to the right and crossed the tracks at a right angle. In our previous opinion we held it could be found, because of a combination of circumstances including impaired view of the tracks and the acute angle of the approach to them, that the crossing was extrahazardous and that defendant owed plaintiff the duty to install automatic signals and/or gates. We also held that a breach of such duty could be found to have been a cause of plaintiff's injuries albeit the driver of the vehicle in which plaintiff was riding drove through a stop sign and upon the track immediately in front of defendant's oncoming train. However, we reversed the judgment because of the improper admission of evidence and, in addition, we abolished the ultrahazardous crossing doctrine and held that a railroad henceforth would be held to owe the duty of ordinary care to the motoring public at its grade crossings.

Prior to its intersection with the railroad, Thurston Road branched off from Mt. Vernon Cemetery Road which, about 1,200 feet north of the Thurston crossing, also crossed defendant's tracks. Lane County suggested to defendant that application be made to the Public Utility Commissioner (PUC) to install automatic gates and flashers at the Mt. Vernon Cemetery

---

[1] *Koch v. Southern Pacific Co.*, 266 Or 335, 513 P2d 770 (1973).

[ 501 ]

crossing and to close the Thurston crossing. They agreed to jointly pay the cost and the defendant cooperated in the county's application to the PUC. Approval of the application was delayed because of a minor change in grade requested by the Highway Commission at the Mt. Vernon Cemetery crossing. After the application was finally approved and while the work was in progress at the Mt. Vernon Cemetery crossing and while the Thurston crossing was still in use, the accident occurred.

One of the assignments of negligence in plaintiff's complaint which was submitted to the jury was the defendant's failure to install automatic signals and/or gates at the Thurston crossing. Defendant contends that because of the statutory authority of the PUC over railroad crossings and because of its regulations which prohibit a change in crossing protection without first obtaining the written approval of the PUC, the jury should have been informed about the legal limitations of defendant's ability to install crossing protection. Defendant states its position as follows:

"* * * At the trial, a critical issue arose over the materiality of the regulatory system under which defendant can install crossing protection or alter crossings only after securing the written permission of the Public Utility Commissioner. The circuit court refused to instruct the jury in any way about the existence or the legal effect of these limitations; instead, it instructed the jury that public regulation relating to protection at crossings was irrelevant to its consideration of the case under the standard of ordinary care. * * *."

Instructions requested by defendant which the trial court failed to give would have told the jury of the authority of the PUC over the installation of safety devices at crossings and the authority over the signs by the governmental body having supervision of the highway. It also requested instructions that in order for plaintiff to prevail, the jury must find that (1) the defendant should have applied to the PUC for authority to install the automatic signals and/or gates at the

Thurston crossing; (2) the PUC would have authorized the installation of the safety devices; (3) the PUC would have given permission for the installation in sufficient time to place the signals in operation before the accident; and (4) the accident would not have occurred but for the failure to install the automatic devices. Defendant also requested that the allegations of negligence concerning the installation of the automatic devices be withdrawn from the consideration of the jury and that the jury be told to disregard the allegations because of the lack of evidence of (1) through (4) as set forth above. In addition, defendant excepted to the following instruction given by the trial court which concerned the duty which defendant owed to plaintiff:

> "I instruct you that it was the duty of the railroad to exercise reasonable care for the safety of persons using the crossing. In performing this duty, the defendant was entitled to consider recommendations or requirements of governmental agencies. However, compliance with such recommendations or requirements would not fulfill the defendant's duty if in the exercise of reasonable care the defendant ought to have gone beyond such recommendations or requirements."

If defendant's contention concerning the limitation of the railroad's ability to install safety devices because of governmental control is applicable, it is remarkable that this court has not seen it before. Such a contention would have been just as appropriate when cases were tried under the extrahazardous rule and such a charge of negligence was made as it is now when cases are tried under the rule of ordinary care. It is our opinion that the instruction given by the trial court concerning defendant's duty to plaintiff was correct and the instructions requested by defendant either were not material or were given in substance. Defendant is correct that it should not be found negligent for failing to install safety devices which the PUC would not permit. However, there is no evidence that the PUC did not permit such improvements or that he

would have refused to allow them in this instance had application been made.

Plaintiff cites authority to the effect that compliance with statutory or regulatory requirements does not absolve the railroad from liability if the exercise of due care requires more protection for motorists. Such authority does not really speak to the principal issue raised by defendant because, as mentioned in our opinion in the first appeal of this case, there are very few regulatory or statutory requirements concerning safety put upon railroads, and the PUC treats the subject primarily on a crossing-by-crossing basis. Insofar as plaintiff's cited law is applicable, we agree with plaintiff that governmental requirements should be treated as minimum requirements only, in the absence of contrary indication. See Restatement of the Law of Torts (Second) 39, § 288C.

In the absence of evidence of what the PUC would have done had an application been made, the issue is who has the burden of establishing whether governmental authority would or would not have permitted installation of gates and signals at the crossing. Defendant impliedly takes the position that because plaintiff claims defendant was negligent in failing to install such devices, it was his obligation to prove that permission could have beeen secured by defendant for their installation. We hold to the contrary because it seems logical to us that plaintiff should have the duty to prove that due care requires the installation of the devices and, upon such proof, defendant should have the duty of proving that governmental authority would not have permitted it to conform with the requisites of due care. The constraint of governmental authority properly relates to circumstances giving rise to justification or excuse for failure to exercise the reasonable care normally called for in the situation. It is elementary law that circumstances raising the possibility of justification or excuse must be proven by the asserting party. As stated by Wigmore,

"* * * in most actions of *tort* there are many possible

[ 504 ]

justifying circumstances, — self-defence, leave and license, 'volenti non fit injuria,' and the like; but it would be both unfair and contrary to experience to assume that one of them was probably present, and to require the plaintiff to disprove the existence of each one of them; so that the plaintiff is put to prove merely the nature of his harm, and the defendant's share in causing it; and the other circumstances, which would if they existed leave him without a claim, are put upon the defendant to prove. * * *." IX Wigmore, Evidence 275-76, § 2486 (3d ed 1940).

■ Defendant asserts that the jury should have been informed of the statutory and regulatory scheme which gives the PUC control over safety equipment at crossings, even in the absence of specific evidence of what the PUC would have done had a request been made to install such equipment. It argues that the instructions would have informed the jury of the regulatory climate in which it operates and such information was necessary, in addition to evidence of the physical condition of the crossing, to a fair assessment of what a reasonably prudent railroad would have done. We conclude that, in the absence of specific evidence from which it could be found that in this particular instance the regulatory authority would have diminished defendant's opportunity to install safety equipment, such instructions would likely be more misleading than enlightening.

■ Neither is defendant's contention a good one which claims that the issue should have been presented to the jury whether the crossing would have been closed at the time of the accident had the PUC not held up consent to the improvement on the Mt. Vernon Cemetery crossing. There is no evidence that the angle of approach to Thurston crossing or an approaching motorist's view of the track had substantially changed for a considerable period prior to the time the county initiated the application to close it. There is no evidence that during this period defendant made any move to permit it to upgrade the safety at the crossing

or to close it. Therefore, the delay in the approval of the application initiated by the county is irrelevant and in no wise changes or qualifies defendant's claimed breach of duty as a cause of the accident. Had something suddenly occurred which required improvement in the safety of the crossing by the railroad in the exercise of its duty of care to motorists the railroad would have been entitled to an adequate opportunity to make and to apply for consent to make the improvement. However, there is no evidence that this was the case.

■   Both sides talk of increase or lack of increase of vehicular traffic over the crossing as affecting the dangerousness of the crossing and, therefore, the defendant's duty of care to the motoring public. The amount of traffic at a crossing has an effect upon the number of accidents that occur there. However, it has very little to do with whether a crossing is reasonably safe for a motorist in an individual instance. As long as the operation of other motor vehicles is not involved, the danger to a motorist on the approach of a train in an individual instance is no greater or less by virtue of the amount of other vehicular traffic that uses the crossing. The defendant's duty runs to all motorists and is not affected by the duty of due care it also has to many or few who may also use the crossing.

■   Neither should defendant be able to defend on the basis that the governmental body with authority over the highway has not been shown to be willing to help furnish the funds with which to install the safety devices and, thus, help defendant to comply with its common law duty to the class of which plaintiff is a member.[2]

■   The trial court did instruct the jury in another part

[2]There is nothing about the following statute which would prevent defendant from paying the entire cost:

"763.050 Division of crossing expenses between railroad and public authority. The following expenses shall be divided between the railroad companies and the public authority in interest in such a manner

of its instructions that the failure by the railroad to install the automatic devices must be found to be a cause of the accident before plaintiff could recover on that allegation of negligence. Thus, the request for the instruction heretofore enumerated by this opinion as (4) was adequately covered.

Defendant next contends that because of the insufficiency of the evidence the trial court erred in submitting to the jury plaintiff's allegation of negligence which charged defendant with failure to adequately and timely warn of the approach of defendant's train. Prior to the accident two ladies in a convertible were paralleling the train for about a mile on a highway which intersected Thurston Road immediately after it crossed defendant's tracks. Both the train and the automobile were traveling in a southerly direction. The vehicle was about opposite some of the engines to begin with but the engines had pulled ahead slightly at the time of the accident. The driver of the vehicle testified:

"Q. Did you see the impact between the train and the Jeep Wagoneer?

"A. No.

"Q. What further drew your attention to the fact there had been a collision?

"A. I saw the Jeep go up in the air and turn around, you know, and come down, and the bodies and guns and sweatshirts.

"Q. Where was the train in relation to your car at the time of the impact?

"A. Where was it?

"Q. Had the train, in other words, pulled away from you slightly?

"A. Yes, it was pulling away from us slightly. And

---

and in such proportion as the commissioner deems just and reasonable under the circumstances:

"* * * * *.

"(2) The expense of any alteration, abolition or change including signalization and other warning devices at any grade crossings and their separation and maintenance under subsection (2) of ORS 763.030.

"* * * * *."

I'm not sure right exactly where it was when it hit, you know, how far it had gone when it hit the car.

"Q. Did you have the windows in your car up or down?

"A. Up.

"Q. Was the radio going?

"A. No.

"Q. Did you at any time prior to the impact between the Jeep and the train hear a whistle?

"A. No.

"* * * * *

"Q. Now, you mentioned that you never heard a whistle. As I understand it your car was always behind the lead units on that train, the lead locomotive units; is that correct?

"A. Yes.

"Q. And the train was making quite a bit of noise alongside you as it rolled along?

"A. Yes, I suppose it was. The road is right beside the tracks.

"Q. Did you folks have all your windows rolled up in the car?

"A. Yes.

"Q. And as I understand from your sister, that car was a convertible?

"A. Yes.

"Q. If your windows were up I assume the top was covering the convertible?

"A. Yes.

"Q. Did that car have a lot of wind noise in it?

"A. It had more than a regular car. I don't know for sure.

"Q. And —

"A. (interrupting) More than cars nowadays have.

"Q. And were you listening for a whistle as such?

"A. I don't think I was exactly listening for a whistle. I wasn't crossing the railroad track.

"Q. As a matter of fact you did not hear a whistle for the earlier crossing to the north before the accident happened either, did you? Did you hear any whistle for that crossing?

"A. No, I didn't hear any. I did not hear a whistle.

"Q. When you first saw the boys thrown from the car, do you have an estimate, Mrs. Woolery, how far you were from them?

"A. (No response.)

"Q. Just a ball park estimate that you can give us of some idea?

"A. I might have been the distance of a football field or less. I'm not sure because I don't estimate."

It is our opinion that the testimony of the driver of the convertible which was paralleling the train is sufficient to make a jury issue of whether the train whistle was blown for the intersection. Defendant claims such evidence is negative and is incapable of taking the case to the jury. The circumstances under which the failure to hear occurred are determinative in deciding whether the evidence is sufficient to create an inference that the whistle was not blown. It is our conclusion that "in the ordinary course of events" a person in the witness's situation would have heard the whistle had it been blown, without respect to whether or not she was listening for it. II Wigmore, Evidence 778, § 664 (3d ed 1940) contains the following statement:

"* * * Courts have often been asked to exclude testimony based on what may be called *negative knowledge, i.e.* testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen if it had occurred.

"Yet there is no inherent weakness in this kind of knowledge. It rests on the same data of the senses. It may even sometimes be stronger than affirmative impressions. The only requirement is that the witness should have been so situated that *in the ordinary course of events he would have heard* or seen the fact had it occurred. This sort of testimony is constantly received, — particularly in proof of the failure to give railroad signals, * * *." (Original emphasis.)

While the driver's companion was of the opinion that she would not have heard the whistle had it been blown, no such statement came from the driver. The vehicle in which they were riding had paralleled the

[ 509 ]

train for more than a mile in which the train passed over two crossings and the testimony was that four blasts of the whistle are blown for crossings: two long blasts, a short one, and then another long one, the whistles for each crossing consuming the time it takes the train to travel a quarter of a mile. It is difficult to conceive that in the ordinary course of events such a noise would not have been heard from a distance of approximately 300 feet, which is the length of a football field. The vehicle had a cloth top rather than a solid one. While there might be more wind noise there would be less insulation from outside sound. There was no other noise interference, except the noise of the vehicle's motor and the other train noises. We do not believe the noise interference was such as to substantially interfere with a locomotive whistle which was in such proximity and which occurred over a considerable length of time.

We realize there are many cases which hold that failure to hear a particular sound by a person who is not listening for it is insufficient evidence that the sound did not occur. However, it is a matter of degree and it is recognized that some sounds by their very volume and proximity will nevertheless be heard. As an extreme instance, see the sample given in *Clough v. Prudential Ins. Co.,* 235 Or 625, 630, 386 P2d 464 (1963). The Oregon cases on the subject are legion and little can be gained by case matching as in each instance it is a judgment call by the court which is governed by all the circumstances then attendant. As an example of a case in which the court held the evidence of failure to hear was sufficient although there was no evidence that the witnesses were listening, see *Larson v. Heiniz Const. Co. et al,* 219 Or 25, 60-61, 345 P2d 835 (1959).

Defendant also contends the court erred in submitting to the jury plaintiff's allegation of negligence that the train was being operated at an excessive rate of speed. Defendant argues that speed is largely irrelevant because there is no possibility of stopping or

maneuvering a freight train to avoid an accident at an intersection. It also contends that it was within the required and usual speed for that location and, therefore, there can be no inference of negligence.

There were no governmental requirements or limitations upon the speed of the train. The speed limit was one established by the company for the protection of its trains and roadbeds. The angle of the intersection, the visibility of the oncoming train, the equipment there installed for the safety of motorists, the signals given by the train and the speed of the train are all inextricably related in determining the danger and, thus, the care necessitated. We cannot say that the speed of the train was so unrelated to the other conditions as to be irrelevant as a cause of the accident. A speed of 50 miles an hour (the estimated speed of the train) at an intersection which is protected by gates and lights and gongs would, undoubtedly, be entirely safe as a matter of law in a country setting. On the other hand, a speed of 50 miles an hour could be found to be excessive where there are no gates or lights or gongs, where the visibility is impaired, where the angle of approach to the intersection is acute, and where no whistle is being blown. It is our conclusion that the trial court did not err in submitting the issue of the speed of the train to the jury.

The issues of whether the whistle was blown and whether the train was being operated too rapidly were present in the first trial and not submitted to the jury for the reason the trial judge concluded the evidence was insufficient to justify their submission. Defendant asserts that because no appeal was taken therefrom by plaintiff, he is barred in the second trial from relitigating the issues. Defendant contends the rulings of the trial court in the first trial became the "law of the case" and were binding upon retrial.

The policies underlying the doctrine of the "law of the case" essentially parallel those served by the doctrines of *stare decisis* and res judicata/preclusion, i.e.,

[ 511 ]

consistency of judicial decision, putting an end to litigation of matters once determined, and preserving the court's prestige. Vestal, *Law of the Case: Single-Suit Preclusion,* 1967 Utah L Rev 1 (1967). Briefly stated, the doctrine of the law of the case precludes relitigation or reconsideration of a point of *law* decided at an earlier stage of the *same* case. The rationale is that a court should adhere to a previous ruling on an identical matter, whether rightly or wrongly decided, in order to advance the policies enumerated above. There is no uniformity among the jurisdictions either in the stages at which the doctrine is given effect or in the rigidity with which it is applied. Vestal, *supra* at 2-4.

No cases concerning the "law of the case" have come to our attention in which the *successful* plaintiff in the lower court in the first trial has upon retrial been precluded from litigating an issue because he failed to cross-appeal or otherwise to raise an unfavorable ruling in the first trial on the sufficiency of the evidence to sustain that particular issue. Defendant cites language from cases in which the appellate court had decided the specific issue in question in an appeal from the first trial.[3] It also quotes language from a case which holds that where a new trial is granted because the trial judge believes an incorrect instruction was given, the aggrieved party who fails to appeal is precluded, upon his appeal from a retrial, from claiming as error the trial court's failure to give the same instruction.[4] None of these authorities adequately covers the present situation.[5] It is our conclusion that in *most* instances remanding for a new trial should mean just that—not a fragmented or partial retrial—unless

[3] *Peltier v. Dahlke,* 256 Or 84, 471 P2d 434 (1970); Simmons v. Wash. F.N. Ins. Co., 140 Or 164, 166, 13 P2d 366 (1932).

[4] *Williamson v. SAIF,* 6 Or App 95, 487 P2d 110 (1971).

[5] A compendium of Oregon cases dealing at least tangentially with the "law of the case" is as follows: *Barr v. Linton Plywood Ass'n,* 232 Or 298, 375 P2d 84 (1962); *Adskim v. O.-W.R.&N. Co.,* 134 Or 574, 294 P 605 (1930); *Budd v. Multnomah St. Ry. Co.,* 15 Or 404, 15 P 654 (1887); *City of Idanha v. Consumers Power,* 13 Or App 431, 509 P2d 1226, *S Ct review denied* (1973).

the appellate court specifically so directs. To do otherwise in the present instance would be to defeat the purpose behind the rule of the "law of the case," i.e., more efficient judicial administration. The proliferation of issues upon appeal by forcing a *successful* plaintiff to "protect his wicket" on *all* issues would not promote the purpose of the rule. We assume that this accounts for the lack of authority for the application of the rule in the exact situation presented here. It is our conclusion the trial court did not err.

Defendant next asserts that the court erred in failing to instruct the jury that plaintiff could not recover if the *sole* cause of the accident was the failure to stop at the stop sign at the crossing by the driver of the vehicle in which plaintiff was a passenger. Instead, the trial court told the jury that plaintiff could not recover in the absence of proof that defendant was guilty of negligence which was a cause of the accident. The instruction given, of course, if followed, precludes a verdict for plaintiff where the negligence of the plaintiff's driver was the sole cause of the accident. Defendant recognizes that in order to adopt its position we would have to overrule our prior cases[6] holding the giving of a similar instruction in related situations to be within the discretion of the trial judge, who is permitted to limit his instructions to allegations against the defendant or who can, if he believes clarity so demands, enhance such instructions by pointing out that defendant cannot be held responsible if the sole fault for the accident is that of a third party. We do not choose to change our present rulings.

As a last assignment of error defendant contends that it was entitled to a directed verdict because none of the specifications of negligence submitted to the jury could provide a basis for a verdict against defendant. As this opinion would indicate, it is our conclusion that the evidence supporting each one of the alle-

---

[6]*Leathers v. Snook,* 238 Or 177, 180, 393 P2d 764 (1964); *Lovins v. Jackson et al,* 233 Or 369, 382, 378 P2d 727 (1963); *Denton v. Arnstein,* 197 Or 28, 46-48, 250 P2d 407 (1952).

gations of negligence submitted to the jury was sufficient to provide a basis for plaintiff's verdict.

The judgment for the plaintiff is affirmed.